**ORIGINAL**

Mr. James Carlin
San Quentin State Prison
P.O. Box C-22727
San Quentin, CA 94974

Petitioner in pro per

**FILED**

JUL 1 9 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| **United States District Court** | Dist: | Northern |
|---|---|---|
| Name (under which you were convicted): C V<br>James Carlin | | Docket or Case No.:<br>10 3156 |
| Place of Confinement:<br>California State Prison, San Quentin | | Prisoner No.:<br>C-22727 |
| Petitioner (include the name under which you were convicted)<br><br>James Carlin    v. | | Respondent (authorized person SI having custody of petitioner)<br><br>Vince Cullen, Acting Warden |
| The Attorney General of the State of | California | |

## PETITION

This petition challenges the State of California's (Executive Branch) refusal to parole Petitioner James Carlin ("Carlin") from his indeterminate life sentence. Carlin thus has revised and simplified the standard form for a petition, which is designed for challenges to State custody on the basis that the judgment is invalid, to focus on his challenge to State custody that acknowledges the validity of the criminal judgment but challenges the lawfulness of the State's execution of that judgment. In the event that the

Court requires more information than provided by this petition, Carlin requests that the Court permit filing of this petition and grant him leave to amend the petition with any further information the Court may specify be furnished.

1.    (a) Name and location of court that entered the judgment of

conviction leading to your commitment to prison on an

indeterminate sentence up to life:          Superior Court, County of

San Francisco

(b) Criminal docket or case number:          No. 102684

2.    (a) Date of the judgment of conviction:          September 5, 1980

(b) Date of sentencing:          October 24, 1980

3.    Length of sentence:          15 Years to Life consecutive to two-year determinate for use of firearm

4.    In this case, were you convicted on more than one count or of more than one crime:

☐ Yes          ☑ No

5.    Identify all crimes of which you were convicted in this case and the

sentence for each conviction:

Murder, Second Degree (Cal. Pen. Code §§ 187, 190), 15 Years to Life.  Enhancement:  Use of Firearm (Cal. Pen. Code § 12022.5), two years determinate, consecutive, already served

6.  (a) What was your plea? (Check one)

&#9745; (1) Not guilty   &#9744; (3) Nolo contendere (no contest)

&#9744; (2) Guilty          &#9744; (4) Insanity plea

(b) If you entered a guilty plea to one count or charge and a not guilty

plea to another count or charge, what did you plead guilty to and

what did you plead not guilty to?              N/A

(c) If you went to trial, what kind of trial did you have? (Check one)

&#9745; Jury                &#9744; Judge only

7.  Have you previously filed any petition, application, or motion

challenging the State's refusal to parole you [in 2008] from the

sentence imposed pursuant to this judgment of conviction in any

state courts:

&#9745; Yes                &#9744; No

8.  If your answer to the previous question was "Yes," please set forth the

procedural history of the first petition you filed, including each court

level at which it was considered, and give the following information

for each court level:

(a ) First Court Level:

(1) Name of court:   Superior Court, County of San Francisco

(2) Docket or case number:   5995

(3) Date of filing:                    August 3, 2009

(4) Nature of the proceeding:     Petition for Writ of Habeas

Corpus

(5) Grounds raised:

1) Governor's decision to reverse Carlin's parole grant was arbitrary and capricious and in violation of federal and state due process guarantees because the decision lacks any evidence that Carlin is a continued threat to the community or that he otherwise is unsuitable for parole; 2) The executive branch's policy and practice of rarely granting parole to life-sentenced prisoners violates the legislative framework under Penal Code section 3041 that carries a mandate to normally parole murderers with a reasonably proportionate and uniform sentence; 3) The governor's invocation of Penal Code section 3041.2, enacted 18 years after Carlin's commitment offense, to reverse Carlin's parole grant violates the ex post facto clause of the federal constitution; 4) The practice of the authority violates the separation of powers doctrine; 5) The practice of the authority has rendered its regulations unconstitutionally vague; 6) The governor's reversal of Carlin's parole grant violates Carlin's right to be free from cruel and unusual punishment

(6) Did you receive a hearing where evidence was given on your

petition, application, or motion?

□ Yes                    ☑ No

(7) Result (attach a copy of the court's opinion or order, if

available):

Petition Denied (Order attached)

(8) Date of result:  January 19, 2010

(b)  Next Court Level.

(1) Name of court:       Court of Appeal, First Appellate District, Division Four

(2) Docket or case number:   A127919

(3) Date of filing:    March 18, 2010

(4) Nature of the proceeding:       Petition for Writ of Habeas

Corpus

(5) Grounds raised:       Same as in trial court

(6) Did you receive a hearing where evidence was given on your

petition, application, or motion?

☐ Yes                    ☑ No

(7) Result:  Petition denied (copy attached).

(8) Date of result:    April 27, 2010

(c) Next Court Level:

(1) Name of court:          California Supreme Court

(2) Docket or case number:   S182521

(3) Date of filing:       May 10, 2010 (May 7, 2010, pursuant to

California Rules of Court, rule 8.25)

(4) Nature of the proceeding:       Petition for Review

(5) Grounds raised:          Same as in lower courts

(6) Did you receive a hearing where evidence was given on your

petition, application, or motion?

☐ Yes                    ☒ No

(7) Result (attach a copy of the court's opinion or order, if

available):

Petition Denied (Order attached)

(8) Date of result:          June 30, 2010

9.   Did you file any other petition, application, or motion challenging the

State's refusal to parole you **IN 2008**?:

☐ Yes                    ☒ No

10.  If your answer to the previous question was "Yes," please set forth the

procedural history of the second petition you filed, including each

court level at which it was considered, and give the following

information for each court level:   N/A

11.  Please identify any further challenges filed in state court to the State's

refusal to parole you (**IN 2008**), and for each such challenge provide

the information requested above for the earlier challenges.    N/A

12. Did you appeal to or otherwise seek relief in the highest state court

having jurisdiction over the action taken on your petition,

application, or motion?

☑ Yes                    ☐ No

If you did not appeal to the highest state court having jurisdiction,

explain why you did not:      N/A

13. For this petition, state every ground on which you claim that you are
being held in violation of the Constitution, laws, or treaties of the
United States. State the facts supporting each ground.

## GROUND ONE:

CALIFORNIA AUTHORITIES' REFUSAL TO RELEASE
CARLIN ON PAROLE HAS DEPRIVED HIM OF DUE
PROCESS OF LAW UNDER THE FEDERAL CONSTITUTION.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts
that support your claim.)

A. The Parole Consideration Hearing on March 25, 2008.

On March 25, 2008, Carlin appeared before the California Board of

Parole Hearings for the 14th time. As detailed below, all of the information

presented supported the Board's finding that Carlin was suitable for parole.

1.      Post Conviction Progress and Rehabilitation.

        a.      Programming During Incarceration.

In his almost thirty years in prison, Carlin has received only one "serious" rules violation or CDC 115, an administrative one twenty-three years ago in 1986 for possession of a TV set that was not properly logged. Otherwise, Carlin received a few 128A counseling chronos[1] in the first few years of his incarceration essentially for anti-authority attitudes he expressed towards guards, the last of which was in 1986. In 1989 Carlin expressed his feeling that no sentence of imprisonment would compensate for his taking the life of the victim, but he had come to an understanding that submitting to authority would more adequately pay for his crime than simply serving a long sentence. Carlin has had no 115s or counseling chronos for the last 23 years, establishing that he transforms his words to enduring action.

Although he arrived in prison with a bachelor's degree, he has continued his education, obtaining an AA degree in Liberal Arts and taking numerous other classes as well. In addition, in his own time Carlin does a tremendous amount of reading on wide-ranging subjects.

Vocationally, Carlin has taken electronics and extensive computer training through which he developed a high level of skill. He has worked

[1] Counseling chronos are CDC documents on form 128 that record "minor misconduct" not amounting to even an administrative rules violation. (See Cal. Code Regs., tit. 15, § 3312 (a)(2); see also *In re Smith* (2003) 109 Cal.App.4th 489, 505 ["In prison argot, 'counseling chronos' document minor misconduct, not discipline." Only "serious misconduct while in prison is a circumstance tending to show unsuitability" for parole.].) (*Id.*, quoting Cal. Code Regs., tit. 15, § 3312.)

throughout his incarceration with average to excellent work evaluations. For some years he has worked as a clerk in the law library, and before that as a clerk in the Jewish Chapel. He has excellent relations with staff, being trusted to set up their computers, and repair serious problems in institutional computers.

Over his many years in prison, Carlin has participated in numerous self-help groups. Before 2007 these included NA, AA, Toast Masters, various IMPACT sessions on different subjects, Moral/Social Accountability, How to Develop Positive Support Systems, The Importance of Self Responsibility, Development of High Self Esteem, and others. At his 2008 hearing Carlin presented numerous additional self-help certificates and chronos showing participation by Carlin in the year before the 2008 hearing. These included: AA (throughout year), T.R.U.S.T (more than one), Nonviolent Communication (more than one), IMPACT (various 13 week sessions on addiction), Anger Management (more than one), Building Relationships, and Community Health Certificate.

      b.    Psychological Evaluations and Therapy.

There have been numerous psychological assessments of Carlin over his almost thirty years in prison, and these were summarized by the deputy commissioner in the parole decision in 2008:

> ...[I]n looking over your psych reports, I went back
> to your CAT-X report in 1995, when the doctors,
> after a very rigorous examination, noted that you
> were below average in your level of violence and
> your assessment of dangerousness. Again, in 1996,
> the doctor said you were below average. In 1997,
> you were below average. Dr. [Deign an], in the year

2000 noted ... -- that you have done work in rehabilitating yourself from a lifestyle and attitude which brought you to prison in the first place. That you're, after 20 years of incarceration, you seem to be rehabilitated and that your former lifestyle appears to be that of a younger man and now you have a different set of interests and are ... [it is] not likely [you would] engage in criminal action again. And then there was a lot of talk and I was on the Panel last year. And I did have questions about the '05 psych report written by dr. Goldwin [ph. – sic] was just an assessment of your insight. Ant then when Dr. Inaba wrote her report, she was actually addressing Dr. Goldwin's assessment of your insight and I think matters got confused and the format wasn't one that was used by the Board ever and became confusing. So when we looked at Dr. Starrett's report and looking at you in '07, we, like previous panels have told you, thought you were a very good candidate, but we wanted a solid psych report to move you forward in the process. And Dr. Starrett talked about your recognition of alcohol and drugs being a problem in your life and you addressing it, giving you a very high global assessment of functioning score and noting that your polysubstance abuse was in remission and had been. And that you8r antisocial personality disorder was in remission. And administering the four tests that we administer now in assessing your risk of recidivism and your level of violence and the only domain where you scored in the moderate level was historical. And that's never going to change; that's who you were. But on the test that assessed who you are and where you're going, your assessment was rated at a very low level. "In the overall risk assessment, the inmate's level of psychopathy is low, indicating low probability for future acting out. The inmate's overall risk potential is in the low range when compared to other

inmates." In looking at what Dr. Jasmine Tehrani
wrote, in 2008, she felt that Dr. Starrett had
adequately addressed that. That it was the Panel's
obligation to go further into that and make our own
calculation and we did that.   We asked you many
questions. And although you're not a parrot and ...
you speak from your mind and your heart and you
speak the truth. And it's your truth that came out
today and it really showed that you do have remorse
and insight and you're not the person that made
those decisions that brought you to prison. And I
truly believe that or I wouldn't give you a date.

    c.    Support Letters.

Carlin had numerous support letters from family, friends, and from
people who have come into contact with Carlin in the institution. He is still
married to his wife of approximately 35 years, Lois, and she wrote a very
supportive letter. Tara, his daughter, wrote that Carlin has remained a
good father to her, and they have a close relationship in which he is very
supportive of her. Carlin's mother and brothers also offered their support.
Carlin has three definite job offers, two offers of residence, and marketable
skills in computers, as a carpenter, and as a self-taught paralegal.

    d.    Parole Plans.

Carlin has a residence with his wife and daughter in Marin County, as
well as a back-up residence with Michael Satris, an attorney who lives in
Bolinas in Marin County. Carlin remains a member of the carpenter's
union, and is interested in obtaining work as a carpenter. If that is not
feasible, Carlin has job offers from the Law Offices of Michael Satris in
Bolinas, and the Pier Five Law Offices in San Francisco, to perform general

legal support and paralegal duties. He also has a job offer in Sonoma County with a relative who has a large property, vineyards, and a construction company.

Carlin intends to continue with AA or NA immediately upon his release as often as he can, and would like to assist in establishing other types of violence prevention groups in Marin County, or assisting with those groups in the Richmond or Oakland.

     e.    Current Attitude Towards the Crime.

At the hearing, Carlin expressed his responsibility and remorse for his crimes, which he had also done in hearings and statements to evaluators over the last few years. *See, e.g.,* pp. 17-20, *post.* In the decision portion of the hearing the panel stated in regards to remorse:

> Dr. Jasmine Tehrani [in a 2008 secondary review letter constituting the 2008 psychological evaluation333] ... felt that Dr. Starrett [who wrote the 2007 psychological evaluation] adequately addressed [insight]. That it was the Panel's obligation to go further into that and make our own calculation and we did that. We asked you many questions. And although you're not a parrot and you won't say – you speak from your mind and your heart and you speak the truth. And it's your truth and it came out today and it really showed that you do have remorse and insight and you're not that person that made the decisions that brought you to prison. And I truly believe that or I wouldn't give you a date."

     f.    Pre-Conviction Background.

Carlin was born November 26, 1946, and grew up Roman Catholic in a stable middle class family in New Jersey. He did have some juvenile history for firecrackers, larceny (leather jackets), a motor vehicle violation having to do with a motorcycle, and fighting three months before his 18th birthday. He attended Rutgers University, beginning in engineering but ultimately obtaining a B.A. in philosophy. Intermittently during those years he ran afoul of the law because of his involvement with marijuana and associating himself with people in that subculture. He was convicted of possession of hashish, petty theft, and an assault with a dangerous weapon for which he received a three month suspended sentence, concurrent with a sentence on another undetermined offense. His attendance at Rutgers was interrupted when he served almost two years in prison, from ages 19 to 21, for the offense of selling marijuana to an FBI agent in February of 1966.

In approximately 1976 he married Lois Esser, and they had a daughter, Tara. For several years before, and the first few years of, his marriage Carlin worked as a carpenter, supported his family, and lived a law-abiding life. When Tara was a toddler, Carlin suffered an injury to his arm that disabled him from working for a time. He was prescribed painkillers for his injury which he had been taking and likely abusing up to the time of the offense. His lack of income and the living situation whereby Carlin and his family shared a place with one of his wife's sisters led to strains in the marriage, though it remained (and remains) intact. During a period when Carlin's wife and daughter were to be back East for a wedding, Carlin decided to go to San Francisco after a long-time acquaintance from back East who was staying in a seedy hotel there contacted Carlin.

## 2. The Circumstances of the Commitment Offense.

The Board accepted the statement of the commitment offense as contained in the probation report, pages 2 through 5, which provides as follows:

> According to reports, on June 10, 1980, the defendant confronted several acquaintances with the fact that his .9 millimeter gun had been stolen from his room in the Golden Eagle Hotel on Broadway. The defendant suspected John Travis, Robert Evans, or Curtis Jackson of the theft. John Travis denied his guilt and related that he had two guns of his own in his room. The defendant, Mr. Travis, one Bernard Verrett, and one Bob Miliorisi, went to Mr. Travis' room in the Golden Eagle. The defendant took Mr. Travis' .45 revolver. all four men then left the Golden Eagle and walked to the Marconi Hotel on Broadway to speak with Robert Evans. Mr. Evans denied taking the defendant's gun but indicated that Curtis Jackson had taken it. Mr. Evans joined the other men who were returning to the Golden Eagle to speak with Curtis Jackson; Bernard Verrett remained behind.
>
> Robert Evans knocked on Mr. Jackson's door at the Golden Eagle as Mr. Jackson knew him and would let him in. After Mr. Evans identified himself, Curtis Jackson opened his door a few inches, at which point the defendant fired one shot which hit Mr. Jackson in the chest; he died almost instantaneously of the gunshot wound to the chest.
>
> After the shooting, the defendant, who appeared dazed, indicated that he was going to San Rafael. The murder weapon, which Mr. Travis reported that he had taken from the mattress of Robert Evans a

few days earlier because Mr. Evan's was using it to
enact rapes and robberies, was not recovered.

The San Rafael Police Department assisted in
locating the defendant. On June 3, 1980, he had
been listed as the suspect in the burglary of a
television set from the home of his ex-sister-in-law,
Carol Esser, at 458 Vista Del Mar, San Rafael. She
related that her sister, the defendant's ex-wife,
resided with her but had left for New Jersey on June
1, 1980. She believed that the defendant had a key
to the residence; there was no sign of forced entry.

San Rafael Police officers responded to 458 Vista
Del Mar at approximately 10:35 pm, almost five
hours after the shooting occurred. The officers were
advised that the defendant had gone to the airport
to pick up his wife in a station wagon. At
approximately 10:35 PM, the defendant was
observed as a passenger in a vehicle a few blocks
from Vista Del Mar. The vehicle was detained and
the defendant was placed under arrest. His wife,
child, and the driver of the vehicle were not
arrested.

The probation report contained further information as follows:

Carlin explained the problems in his living situation before the offense, and

said he had gone to San Francisco while his wife and daughter went back

East for a trip. At that time Carlin had also suffered an injury to his arm

that prevented him from working and for which he was on disability. An

old friend of his from New Jersey was staying at the Golden Eagle Hotel in

North Beach and it was cheap. Carlin was at the Golden Eagle when he met

Robert Evans and Curtis Jackson for the first time. He agreed to buy them

a small bottle of vodka. They all went back to Carlin's hotel room, where he

learned Jackson lived next door to him. Carlin noticed Jackson and Evans playing with his attaché case, which contained a pistol and bullets which he was holding for a friend, Fred Frankovich. Carlin wanted to get rid of his visitors, and told them he would get them some heroin in the Haight. When he returned a few hours later, he saw the lock to his room was broken and the outside window was open; the attaché case was gone. Carlin knocked on Jackson's door and asked to speak with him, but Jackson told him to go away. Carlin then called the police; when they arrived he told them Curtis Jackson had taken his gun but could offer no proof. The police left. Bob Migliorisi returned with John Travis and Bernie Verrett who said they would get the gun back if Carlin paid them, and he agreed. Travis told the group that Jackson and Evans were dangerous, and had been raping and robbing women. Carlin and Migliorisi armed themselves with guns from Travis's room, and went down the street to find Evans. Evans denied he had stolen the gun, and said Curtis Jackson had it, but would should Carlin. They took Evans back to Jackson's room as Jackson would open the door for Evans. Carlin was behind Evans, who knocked on the door and jumped away as it opened. Carlin started to step into Jackson's room and thought he saw a quick movement or a gun in Jackson's hand; Carlin put his gun up but did not squeeze the trigger.[2] Carlin felt the gun went off

---

[2] Much has been made of Carlin's statements, but he explained in 2002 to the Board that, because he did not remember intending to shoot Jackson or pulling the trigger, in thinking after the fact about what happened he concluded in his mind that the shooting was accidental, triggered by a sense of sudden movement and/or belief Jackson had a gun. He candidly admitted, and has understood for many years, that he is responsible for the murder because he is the one that went to Jackson's with a loaded gun; that

accidentally. He saw the hole in Jackson's chest and could not believe what happened.[3] He went to Travis's room and gave the .45 back to Verrett. He then went outside and met some friends waiting to take him to the airport to pick up his wife. When Carlin picked her up at the airport he told her what happened, and they agreed to call an attorney from the home. He was arrested en route. She confirmed he told her at the airport that he had shot someone, and she did not believe him as it was out of character. The probation officer specifically stated: "Although the undersigned does not believe that the defendant had premeditated the murder, he was not an innocent person being led astray by his associates and surrounding but, rather, was an active participant and leader in a potentially dangerous situation involving loaded weapons which, unfortunately, materialized to fruition resulting in the loss of human life."

According to the 2008 Board report, Carlin's statement regarding the offense remained the same as in previous reports. The most recent Board report prior to 2008 to set forth such a statement was in 2007, as follows:

> Carlin met Curtis Jackson and Robert Evans for the
> first time on the day of the shooting. Carlin agreed

---

doing that was likely to result in serious injury or death; and thus even if in retrospect he struggled to understand what happened when he fired the shot that killed Jackson as he did not remember pulling the trigger, did not go to Jackson's with the intent of shooting him, and saw a movement that made him think Jackson had a gun, he was responsible for murder because of his initial choice to pick up a loaded gun and take it to confront Jackson. Thus, Carlin has described in his own words no later than 2002 an implied malice state of mind, and actions along with it, to support a second degree murder conviction, apparently the basis for the jury verdict.

[3] This harmonizes with the probation report where a witness said Carlin looked dazed after the shooting; both are inconsistent with either premeditation or a specific intent to kill.

> to buy the two men a bottle of Vodka and the three
> met and returned to Carlin's room at the Golden
> Eagle Hotel. Jackson and Evans began playing with
> Carlin's attaché case, which contained a handgun.
> In order to get the men to leave his room Carlin
> agreed to go out and get them some Heroin. Carlin
> left the hotel and went out for a couple of hours.
> When he returned he saw that the lock on his door
> had been broken and his attaché case was missing.
> Carlin notified the police of the missing gun and of
> his suspicions that Jackson had stolen the gun but
> he could offer no proof. Carlin had learned that
> both Evans and Jackson were considered
> dangerous, so he armed himself and went to
> confront Evans over the theft of the gun. Evans
> indicated that Jackson had stolen the gun. They
> returned to the Golden Eagle Hotel where Evans
> knocked on Jackson's door. Carlin started to enter
> Jackson's room after Jackson opened the door and
> thought there was a gun in Jackson's hand. Carlin
> raised his gun and it accidentally discharged. Carlin
> states he never pulled the trigger and he was acting
> in self-defense. He states that he is a non-violent
> person and was in the wrong place at the wrong
> time.

During the 2008 hearing, upon his attorney's advice, Carlin invoked

his right not to discuss the commitment offense with the Board for, as his

attorney pointed out, it had been discussed over and over for years and was

extensively laid out upon the record. He did tell the Board that he

disagreed with his attorney's statement that this was a "run of the mill

second degree murder," and said: "The taking of a life will change you. ...

It's my crime. It's my murder. I did it. It's a horrible thing." "I've thought

about [what I have done] for 28 years." "I feel terrible about this crime, but

I don't [know] what else I can do about it." "I always feel bad about Curtis

Jackson. I just don't know what I can do about that except pay my debt to society, according to the law, – and [take] these programs...."

Carlin had discussed the offense in previous hearings with the Board. In 2005 Carlin explained he had been in San Francisco, living in a cheap residential hotel, because he was unemployed due to an injury, apparently abusing his prescribed pain medication and not thinking straight, feeling depressed as a new parent with a baby girl he could not support, and having problems in his marriage. Carlin then described the circumstances leading up to the offense much as they were described in the "prisoner's version" of the offense in the 2007 counselor's report. Carlin acknowledged that he had been angry at the system at the beginning of his incarceration, as was his wife, believing that his was a case of self-defense that the system refused to recognize. Now Carlin realizes that was not the case. He created the situation. He armed himself with a gun, and he should have realized the high risk he created. Not only was that against the law, it was morally criminal. He should not have put himself in the situation he did, and into the toxic associations that he had. Looking back Carlin sees he was going through a "structureless fall, descent," and that he should have had some way to stop himself such as calling someone."

Carlin explained that the offense was a tragedy. He took away any possibility Jackson could have loved and lived a productive life. He will have to deal with it until the end of his life. Carlin also recognized that he frightened and affected many people in the vicinity of Jackson's apartment. His act created a loss to the community. It harmed his own family. Carlin relives the offense over and over, and believes that might be his punishment as well. It cannot be rectified. All one can do is try and find

the people whose lives were upset and try to make amends. Carlin has been unable to locate any of those people, but he does help those around him in the institution.

The Board in 2005, hearing Carlin speak of the offense and observing him as he did so, was very impressed with the insight he showed, particularly as contrasted with the remarks in psychological reports that year that asserted that Carlin lacked insight. Based on what it heard, the Board found it hard to believe that the prisoner in front of them was the one described in the 2005 psychological reports.

In December of 2003, Carlin also made a strong showing of parole suitability, as indicated by the Board's statements that Carlin should be commended for making multiple headway, that Carlin has remorse, Carlin is doing the right kinds of things, he is a positive inmate with positive programming, and everything is falling into place for him. The deputy commissioner commented:

> We had some concern on the psych report because
> there's a little bit of doublespeak in the psych report
> on it. And part of our goal is to make sure that we're
> convinced you fully understand and also that other
> people backup what we feel. Otherwise it's useless
> to set someone for, you know, parole if all the ducks
> are not in a row. And we thing that they're very,
> very close, but not quite.

At that time, the prosecutor at the hearing affirmatively told the Board it should find Carlin suitable for parole. Counselor and psychological evaluations at that time predicted he would present a low risk of threat to the public if released.

In 2002, Carlin was asked to explain his statement that the shooting was an accident, Carlin answered:

> Well, it's hard to say. I mean I didn't deliberate to shoot him, no. ... But I can't see how it could go off – I raised the gun, and it went off. But I don't remember pulling the trigger. Like thinking before hand, I'll pull the trigger and shoot this person. That's what I meant by accident. I mean this is a matter of semantics at this point because the facts are I saw the man and I raised the gun and shot him. ... After that it's just what did I think at the time, and it's a matter of a little bit of alcohol, a little bit of whatever the doctor was giving me for my arm, and trying to think why I [did] that.

Carlin and the Commissioner agreed how they both were just trying to figure out what happened. Carlin gave an example of an accident, and then contrasted it to what he did:

> Well, I'm going to someone's house with a gun is like setting yourself up. I mean everything could be an accident after that. But just leading up to that, I mean the intent to going to someone's house with the gun, is the part that's wrong, that I believe is wrong. [¶]
>
> That's wrong. Yeah, that's the part that's wrong. No matter what I'm thinking at the time, or what I think happened at that instant, I know that it was wrong to take a gun and ... go anywhere where you think you might have to use it. ... Anything that happens after that, the consequences are on you.

Carlin continued upon the Commissioner's further questioning about different versions of the offense and whether Carlin shot Jackson in cold blood:

That's what I thought happened [i.e., it was an accident, I didn't pull the trigger, the gun went off accidentally]. But my mind could think because I'm not thinking about killing anybody. So I'm thinking, how did the gun go off? One shot, here's the person that's dead. It's like the whole thing is like ... a mystery. This is horrible. What is going on here? [¶]

..........................................................................

... [I]t's just ... it was horrible. I mean I just don't, you know, I've got to bring up every time I talk to you people and when I go see the psychiatrists and stuff. [¶] ...And it's just like, I can't undo it. ... This life was ended, you know.

There was mention of the fact that Jackson had been paroled for the third time from San Quentin, and whether that was a "mitigating" factor. Carlin answered, [t]hat doesn't make him any less a human being. [¶] My lawyers wanted to say something about that. But I figured, what's the difference. ... The guy's dead. That's what matters."

Eight years ago, in 2001, a representative of the San Francisco District Attorney's Office appeared at Carlin's parole hearing and stated there was "absolutely no opposition to [Carlin's] getting a parole date."

### 3. The Board's 2008 Decision to Grant Parole.

The Board concluded Carlin was "suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison." The Board recognized the 28-year-old commitment offense was both "heinous" and "callous." It found the offense to have been carried out in a manner demonstrating callous disregard for public safety; that Carlin had several opportunities to cease but he continued; and that

motive for the crime, to retrieve a gun, was very trivial in relation to the offense.

In assessing Carlin's suitability, the parole authority is governed by California Code of Regulations, title 15, section 2402, which states that "circumstances tending to show suitability for parole include that the inmate (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his or her life, especially if the stress had built over a long period of time; (5) committed the crime as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that suggest an enhanced ability to function within the law upon release." (Cal. Code Regs., tit. 15, § 2402, subd. (d).)

     a.    Carlin Has No Record of Violent Crime While a Juvenile.

The Board found Carlin has no juvenile record of assaulting others.

     b.    Carlin Has a Stable Social History.

The Board found that Carlin has a stable social history as shown by reasonably stable relationships with others, including a wife of many years[4] and his daughter, as well has relationships formed in prison that show stability in relationships with others. He has maintained close family ties with family and friends while in prison.

---

[4] In fact their marriage is still intact nearly 35 years later.

### c. Carlin Has Expressed Signs of Remorse.

The Board found that Carlin does "show signs of remorse[,] ... [indicating] to this Panel that you do understand the nature and magnitude of the offense." The commissioner went on to note there has been in his case a question of insight, and the panel addressed the issue in depth and found Carlin's statements — despite malapropisms on his part resulting possibly from nervousness but not indicating any malice — to show an understanding of the nature and magnitude of the offense, and a desire to "become involved in society in a very appropriate way."

### d. Carlin Was Under Significant Stress at the Time of the Commitment Offense.

The Board did not mention the stressful circumstances in Carlin's life occurring before the commitment offense, but in fact he was unable to work due to an injury to his arm, and therefore unable to support his wife and small daughter; he was taking pain medication prescribed for his arm; and there was marital strain that had developed over some period of time due to their living situation. At the time of the offense his wife and daughter were back East for three weeks to attend a wedding, but they returned before the wedding took place because Carlin had been calling his wife and she returned early because he seemed to be having problems.

### e. Consideration of Battered Woman Syndrome is Not Relevant.

### f. Carlin Lacks a Significant Criminal History.

The Board made no mention one way or the other in the decision granting parole of Carlin's prior record, in which there were two instances where he displayed a gun in situations involving drugs and law

enforcement; in one of those cases he was sentenced to prison and served almost two years. There was no physical contact and there were no physical injuries inflicted in either of those situations. He had a couple other convictions for possession of marijuana/hashish and a conviction for petty theft in a grocery store.

      g.    Carlin Has a Reduced Probability of Recidivism.

The Board found that Carlin's advanced age of over 61 years, as well as his growth and greater understanding, reduced his probability of recidivism.

      h.    Carlin Has Realistic Plans for Release and Marketable Skills.

The Board found Carlin has realistic parole plans "that include multiple job offers and family support ... [of a] place to reside ... [with] options as to residence including that of attorney Michael Satris...." It found that "you also have acceptable employment plans including two job offers." The Board noted the evidence provided by Carlin of a relapse prevention program of attending AA/NA and becoming involved in the non-violent offender program in the county of parole and actively preventing his own recidivism.

      i.    Carlin Has Participated in Numerous Institutional Activities and Has Shown His Ability to Function Within the Law.

The Board found that while incarcerated Carlin "maintained positive institutional behavior, which indicates significant improvement in self-control above the commitment offense." His only 115 was for contraband possession for a TV set left in Carlin's cell by another inmate but not

properly logged, and nothing for violence. "While in prison, [Carlin]
enhanced his ability to function within the law upon release through
participation and educational programs, self-help, vocational programs,
and institutional job assignments." The Board cited Carlin's exhaustion of
the available self-help programs:

> You've been in either NA or AA since 1990. You've
> recently completed IMPACT program about
> substance abuse and have really taken it seriously
> the fact that you no longer can use substances and
> armed yourself with strategies so that won't be a
> concern; even making sure that you have AA groups
> in the community that will help you upon parole.
> You've done Anger Management, IMPACT, sessions
> on relationships, Cultivating Successful
> Relationships. You've done Cartargio. You've
> completed the TRUST program in the last year and
> also non-violent communication, which I think is a
> really good program, and the Art and Science of
> Building Relationships you completed in November
> of '07. So, with every time you came to a Board
> hearing and you got a one-year denial, you
> enhanced your efforts the next year and came back a
> more viable parole candidate. You've also upgraded
> yourself educationally, even though you came in
> with a Bachelor of Arts degree, which is pretty
> unusual. You've taken classes in English,
> Shakespeare, government, history, film
> appreciation, and currently you're doing math and
> others. ... Your work chronos from your
> supervisors report that you do excellent work as
> evidenced staying in the same position for the last
> [seven, eight] years.... [¶] ... as a library clerk here
> in San Quentin.

## D. The Governor's Reversal of the Board's Decision to Grant Parole.

On August 22, 2008, Governor Arnold Schwarzenegger reversed the Board's decision to grant parole. The Governor first relied on the gravity of Carlin's commitment offense, which he characterized as

> especially atrocious because there is evidence that he premeditated, on some level, to kill Curtis. According to the probation report, although witnesses indicated hearing James state that he did not want any trouble, he armed himself with a loaded weapon in preparation to confront Curtis after having been told that Curtis was a dangerous man and would shoot him. James shot Curtis in the chest as Curtis opened his hotel room door a few inches.

The Governor further found the

> motive for the shooting – the belief that Curtis had stolen the attaché – was very trivial in relation to the magnitude of the crime James committed. I believe the nature and circumstances of the life offense, and the gravity of the crime, is evidence that James would present a current unreasonable risk of danger to publish safety if released on parole.

The Governor also concluded that Carlin's "articulation of his responsibility and remorse, and his version of events surrounding the life offense, has varied widely over the years." Carlin has said that when the door opened he raised his arm and the gun went off accidentally, he did not pull the trigger. He said to the probation officer that "when [the victim] opened his door, [he] thought he saw a gun in [Jackson's] hand." Carlin has generally related that someone in the group was in front of him and

knocked on Jackson's door, most often saying it was Evans, once saying it was Bernard Verrett, but at one point he said he was in front with the other guys behind him, he knocked on the door, and "[o]nce he fired at me and he came out, I was scared to the point I almost panicked." As recently as 2005 Carlin purportedly told a mental health evaluator that he acted in self-defense. That same year, however, not mentioned in the Governor's decision, was Carlin's testimony before the parole board that very much impressed it with his insight. In March of 2007 Carlin told the mental health evaluator that the murder of the victim was a horrendous act and that no one had the right to take a life. The Governor also cited as evidence Carlin's attorney at the 2008 hearing, who stated that Carlin had "'pretty much dropped'" his self defense claim."

The Governor acknowledged that the most recent psychological evaluation in 2007/2008 found that Carlin "showed adequate insight," but referred to earlier reports in 2005 containing personal conclusions of those evaluators that Carlin resisted exploring the commitment offense and put forth a version of events that largely absolved him of all responsibility for the killing, and that he avoided coming to terms with the gravity of his actions and disavowed personal responsibility. The Governor also referred to a 2003 psychological report that rated Carlin at a very low risk for future violence but claimed he did not have any insight into what initially attracted him to the character of a gangster.

When viewed as a whole, the 2005 psychological evaluations — especially that of Dr. Goldyne — are aberrations in Carlin's long history of such evaluations. In addition Dr. Melvin Macomber, a very experienced psychological evaluator, long employed by the CDC, had reviewed an

evaluation done by Dr. Goldyne on another prisoner, and made the
following comments: Dr. Goldyne was a student at the time of his
evaluations; he conducted a brief, one hour, confrontational interview that
was pejorative and in which he took statements out of context, left out
relevant information, and made irresponsible, unfounded and unsupported
diagnostic suggestions; conclusions of lack of insight were the result of his
hostile and antagonistic interview approach; he was inaccurate in many of
his conclusions; as a whole, his evaluation was surprisingly inadequate and
inaccurate. Dr. Goldyne's evaluation smacks of an unprofessional personal
approach to Carlin that resulted in a biased evaluation, both in tone and in
substance. The subsequent evaluation by Dr. Inaba later in 2005, relied
heavily on Dr. Goldyne's evaluation. In comparison to the extensive, in
depth, prolonged Category X evaluations done by several mental health
evaluators, which concluded as far back as 1995 that Carlin was "below
average" in violence potential in the free community, that he had explored
the commitment offense and appears to have come to terms with the
underlying causes, and that there is "no further need for therapy
programming while incarcerated," other psychological evaluations, and the
2007 evaluation, the 2005 evaluations are unreliable.

The Governor found inconsistencies in Carlin's statements regarding
his drug use, i.e., that Carlin had said he used no drugs at all around the
time of the offense but only earlier, whereas elsewhere he admitted
smoking marijuana at the time of the offense. Carlin has given different
statements regarding his "drug use" before the offense, including that he
smoked a couple of marijuana cigarettes on weekends during the time
leading up to it, that he had not "used" drugs for several years before the

offense, and that he had not "used" drugs for the year before the offense. Aside from the fact that any purported inconsistency in these statements is highly questionable, i.e., rather than semantics as Carlin viewed drug "use" as different from smoking a couple of marijuana cigarettes on the weekends leading up to the offense, the fact there are alleged inconsistencies in Carlin's memory of whether and when he was "using" drugs 28 and more years ago provides no support for a conclusion that Carlin constitutes an unreasonable risk of danger to the public if released on parole now. It is undisputed that Carlin has engaged in substance abuse programming for a couple of decades at least; that he has had no substance-related rules violations in his entire incarceration; and that psychological evaluations do not see him at risk for substance abuse.

The Governor also found Carlin's prior record, including his mature age of 33 at the time of the commitment offense, to support a denial of parole. He stated that Carlin was committed to a children's shelter for fighting as a juvenile, and arrested three additional times as a juvenile. The Governor fails to mention that Carlin's arrest for fighting occurred when he was three months shy of 18, implying instead by his statement "committed to a children's shelter," that Carlin was a young teenager when that occurred. Particularly in light of Carlin's age then, the reference "committed to a children's shelter" is vague and cannot be used as evidence there was any type of disposition, much less one indicating the State concluded this was a serious breach of law. Carlin's age of almost 18 at the time suggests that this was a very minimal detention and consequence, indicating a lack of seriousness to the incident. The other three "arrests" were only that: arrests. Since there was no indicated disposition and there

is no information about the circumstances of those incidents, the brief reference to them on a small card documenting arrests is not sufficiently reliable for these to be considered evidence of parole unsuitability based on a juvenile. The first was a month before he turned 16, for firecrackers. The other two were for larceny (leather jackets) and unspecified motor vehicle violations involving a motorcycle.

Carlin's adult convictions included unlawfully selling marijuana to an FBI agent in February of 1966 to which Carlin plead guilty, apparently in exchange for dismissal of other charges of possession of narcotics and conspiracy to sell narcotics and conspiracy to commit armed robbery; possession of hashish in 1968; petty theft in 1969; and charges of possession of marijuana, assault with a dangerous weapon, false imprisonment of a police officer, exact disposition unknown except that Carlin received a three month suspended sentence for one of those several arrests.. Certainly, the incidents in which Carlin was armed are not de minimis. However, they occurred approximately 35 to 40 years before Carlin's 2008 parole reversal, the guns were not fired, and there was no physical injury to anyone involved. These offenses occurred in the sixties during a period of societal upheaval including widespread use of marijuana and hallucinogenic drugs, and anti-establishment movements, including among college students. This was a time when Carlin was regularly using drugs and involved with people in the drug culture. In one incident where a house was raided by undercover police not in uniform and Carlin fled to the roof not knowing who they were, he turned when told to by law enforcement and, because he had the shotgun in his hand as he turned, pointed it at the officers before immediately dropping it. The disposition in

that case of a three-month suspended sentence, particularly when he had previously served a prison term, indicates the offense was not considered serious by the prosecution.

In conclusion, the Governor found the "gravity of the murder, along with [Carlin's] lack of sufficient insight into or remorse for the life offense, his inconsistent statements, his minimization of his responsibility for his crimes, and his prior criminal history, to presently outweigh the positive factors" and to show that Carlin would pose an unreasonable risk of danger to society.

The Governor acknowledged the evidence of Carlin's rehabilitative efforts that favored parole suitability:

> I considered various positive factors in reviewing whether Mr. Carlin is suitable for parole at this time. Mr. Carlin made efforts in prison to enhance his ability to function within the law upon release. He earned a Health institute diploma and an Associate of Arts degree. He completed vocational training in electronics and computer programming. He also completed college level courses in Math, American Government, U.S. History, Philosophy, Religious Studies, Sociology and Literature. He held institutional jobs including machinist, law library clerk, computer troubleshooter and programmer, Jewish Chapel clerk and draftsman. In addition, he volunteered his time teaching inmates to read. Mr. Carlin availed himself of an array of self-help and therapy activities including Alcoholics Anonymous, Narcotics Anonymous, Anger Management, The Art & Science of Building Relationships, T.R.U.S.T. Workshop, IMPACT (relationships, relationship dynamics and cultivating successful relationships), Attitudinal Healing, The Importance of Self-Responsibility,

> Moral/Social Accountability and Hot to Develop
> Positive Support Systems.
>
> Furthermore, Mr. Carlin received some favorable
> evaluations from various correctional and mental-
> health evaluators over the years. He maintains
> seemingly solid relationships and appears to have
> close ties with supportive friends and family.

Carlin's offense occurred in 1980. At that time, pursuant to section

3000, Carlin was to serve no more than three years on parole.

Carlin has now unlawfully been incarcerated since August 22, 2008,

or a total of almost two years. Carlin is entitled to have those unlawful days

of custody applied to reduce his parole period. *See, e.g., Thompson v.*

*Carey* (E.D. Cal. 2009) 2009 U.S. Dist. LEXIS 47604.

(b) If you did not exhaust your state remedies on Ground One, explain

why:      N/A

## GROUND TWO:

> THE EXECUTIVE BRANCH'S POLICY AND PRACTICE
> OF RARELY GRANTING PAROLE TO LIFE-
> SENTENCED PRISONERS VIOLATES THE
> LEGISLATIVE FRAMEWORK UNDER PENAL CODE
> SECTION 3041 THAT CARRIES A MANDATE TO
> NORMALLY PAROLE MURDERERS WITH A
> REASONABLY PROPORTIONATE AND UNIFORM
> SENTENCE, AND CONSTITUTES A SEPARATE
> VIOLATION OF FEDERAL DUE PROCESS.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts
that support your claim.) The facts set forth in Ground One, and the
following facts support this claim.

California Penal Code section 3041[5] establishes the legislative scheme for the parole of murderers and other life-sentenced prisoners. Its subdivision (a) provides that "the Board ... shall normally set a parole date" at a lifer's first parole consideration hearing. It further provides that "[t]he release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The Board shall establish criteria for the setting of parole release dates ...." Penal Code section 3041, subsection (b) provides that "the panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."

Against a norm requiring the Board to commonly set a prisoner's parole date at his first consideration hearing, the Legislature granted the Board power to defer the setting of a parole date in the exceptional case where it was shown that the individual continued to pose an unreasonable risk to public safety. *See, e.g., In re Rosenkrantz,* 29 Cal.4th 616, 683 (2002) citing *In re Ramirez,* 94 Cal.App.4th 549, 559-560 & 569-570 (2001); see also *id.* at p. 664 ("In sum, the governing statute provides that

---

[5] All further statutory references are to the California Penal Code unless otherwise noted.

the Board must grant parole unless it determines that public safety" would be unreasonably jeopardized by the prisoner's release.)

The parole authority, however, systematically denies parole to life prisoners by unreasonably finding that the release of almost every life prisoner would unduly jeopardize public safety. *See, e.g., In re Rosenkrantz,* 29 Cal.4th at 685 (Board granted parole to murderers 1% of time in its last 4800 hearings). The Board over the years has become notorious for its denial of parole to the vast majority of eligible murderers — both first and second degree — granting parole dates to one to three percent of them, who are then subject to Governor review. *See, e.g., In re Rosenkrantz,* 29 Cal.4th at 685 (Board granted parole to murderers 1% of time in its last 4800 hearings).

When the Board finally does grant a prisoner a parole date, he is usually long past the term set by the Board for his offense, so that even these prisoners are spending years more in prison than called for by the term the Board eventually imposes in accordance with its guidelines. This is the case with Carlin, who in 2008 when granted parole by the Board had already served fifteen years more than his calculated release date.

The extraordinarily high parole denial rate combined with the high gubernatorial reversal rate of the few grants made by the Board (70% or more) turns upside down the legislative mandate that the Board shall normally set a parole date for a prisoner and makes a mockery of the legislative scheme for predictable and uniform punishment for most life prisoners.[6] Indeed, for most prisoners it transforms an indeterminate life

---

[6] As noted in *In re Dannenberg,* 34 Cal.4th 1061, 1087, incl. fn. 8 (2005):

sentence into a sentence of life without the possibility of parole, for more
lifers die in prison than are released on parole. For example, in 2006, 169
lifers died behind bars while only 23 were released on parole. Here, the
Governor's reliance on unchangeable factors about the commitment offense
and prior criminality, and certain inconsistent statements purportedly
showing a lack of insight and responsibility, to conclude that Carlin would
pose an unreasonable risk to the public's safety if released "could be
repeated annually until [Carlin] dies or is rendered helpless by the
infirmities of sickness or age." *In re Scott*, 133 Cal.App.4th 573, 595 (2005)
(*Scott II*).

The recidivism rate for life-sentenced prisoners convicted of murder
and who have served less than half the time Carlin has served is one to
three percent for committing primarily non-violent offenses. That rate is
even lower for life prisoners released when they are over 55 years of age, as
Carlin is. The recidivism rate for non-lifers sentenced to prison in
California ranges from over fifty percent to seventy percent.

> "[N]ormally" [is] a word not susceptible to precise
> application [fn. 8]. Webster's Third New International
> Dictionary (2002) ed.) most pertinently defines "normal"
> as "2: according to, constituting, or not deviating from an
> established norm, rule or principle" and "5: relating to or
> conforming with long-run expectations" [citation], and
> "normally" as "1: in a normal manner: to a normal degree"
> and "2: commonly, usually: in normal circumstances
> under normal conditions" [citation]. The American
> Heritage Dictionary (4th Ed. 2000) most pertinently
> defines "normal" as "1. Conforming with, adhering to, or
> constituting a norm, standard, pattern, level or type;
> typical." [Citation].

The Board members, who are appointed by the Governor and primarily have law-enforcement backgrounds, adhere to and implement a personal and political policy of rarely granting parole in flagrant disregard of the statute. The few Board members who have sometimes followed the law that says parole should normally be granted where there is no basis for a public safety exception have been forced out and criticized for being too lenient. Though the Board is ostensibly an independent agency, in fact it answers to the Governor's political will and bias and pressure from groups that categorically oppose parole for life prisoners.

The findings of studies and informed commentators reflect a growing chorus that the Governor's parole decisions are driven by politics rather than fair consideration of a prisoner for parole according to the applicable legal standards. *See, e.g.*, Ashley Nellis and Ryan S. King (The Sentencing Project, July 2009) *NO EXIT: The Expanding Use of Life Sentences in America* (hereafter "Report") (its findings regarding the California parole experience "illustrate the powerful way in which parole for persons serving a life sentence has become increasingly politicized"); Comment, *Time to Move On: The California Parole Board's Fixation with the Original Crime* (Fall 2008) 27 Yale L. & Pol'y Rev. 239, 246, fn. 48 (referring to "the politicization of the Governor's role in the parole process"); Comment, *In re Dannenberg: California Forgoes Meaningful Judicial Review of Parole Denials* (2006) 39 Loyola of Los Angeles Law R. 899, 931 ("Political calculation certainly permeates the parole decision-making process of the governor"); Comment, *California's Broken Parole System: Flawed Standards and Insufficient Oversight Threaten the Rights of Prisoners*

(Summer 2009) 44 U.S.F. L. Rev. 177, 206 ("politics and prejudice pervade the entire process").

Independent of but consistent with the executive's arbitrary disregard for the legislative mandate for regular parole and its bias against the granting of parole is the arbitrariness of its individual decisions. The executive regularly makes arbitrary findings to justify its refusal to release life prisoners on parole and systematically fails to consider substantial evidence in individual cases that shows the prisoner is suitable for release from prison, just as it did in this case. See, e.g., *In re Lawrence*, 44 Cal.4th 1181 (2008), *In re Calderon,* 184 Cal.App.4th 670 (2010) ; *In re Loresch,* 183 Cal.App.4th 150 (2010); *In re Moses,* 182 Cal.App.4th 1279 (2010); *In re Criscione,* 173 Cal.App.4th 60 (2009); *In re Lazor,* 172 Cal.App.4th 1185 (2009); *In re Lewis,* 172 Cal.App.4th 13 (2009); *In re McGraw,* 171 Cal.App.4th 251 (2009); *In re Rico,* 171 Cal.App.4th 659 (2009); *In re Palermo,* 171 Cal.App.4th 1096 (2009); *In re Dannenberg*, 173 Cal.App.4th 237 (2009); *In re Vasquez,* 170 Cal.App.4th 370 (2009); *In re Gaul,* 170 Cal.App.4th 20 (2009), *In re Burdan*, 169 Cal.App.4th 18 (2008); *In re Aguilar*, 168 Cal.App.4th 1479 (2009); *In re Singler*, 169 Cal.App.4th 1227 (2008); *In re Barker*, 151 Cal.App.4th 346 (2007); *In re Elkins*, 144 Cal.App.4th 475 (2008); *In re Lee*, 143 Cal.App.4th 1400 (2006); *In re Andrade*, 141 Cal.App.4th 807 (2006); *In re Scott, supra,* 133 Cal.App.4th 573; *In re DeLuna*, 126 Cal.App.4th 585 (2005); *In re Scott*, 119 Cal.App.4th 871 (*Scott I*) (2004); *In re Smith*, 114 Cal.App.4th 343 (2003); *In re Smith,* 109 Cal.App.4th 489 (2003); *In re Capistran,* 107 Cal.App.4th 1299 (2003); *In re Ramirez,* 94 Cal.App.4th 549.

The unpublished cases finding arbitrary gubernatorial action in reversing parole grants in the last year are more numerous. *See, e.g.*, *In re Waters,* 2010 Cal.App.Unpub. LEXIS 3569; *In re Ellis,* 2010 Cal.App. Unpub. LEXIS 3361; *In re Rodriguez,* 2010 Cal.App.Unpub. LEXIS 3281; *In re Quarterman,* 2010 Cal.App. Unpub. LEXIS 2544; *In re Jackson*, 2010 Cal.App. Unpub. LEXIS 2420; *In re Tokhmanian,* 2010 Cal.App. Unpub. LEXIS 2337; *In re Penniewell,* 2010 Cal.App. Unpub. LEXIS 2074; *In re Johnson,* 2010 Cal.App.Unpub. LEXIS 369; *In re Gaul,* 2010 Cal. App. Unpub. LEXIS 246; *In re Martinez*, 2009 Cal.App. Unpub. LEXIS 9070;*In re Ayala,* 2009 Cal. App. Unpub. LEXIS 6283; *In re Sanchez,* 2009 Cal. App. Unpub. LEXIS 4847; *In re Ignacio*, 2009 Cal. App. Unpub. LEXIS 4860; *In re Miller,* 2009 Cal. App. Unpub. LEXIS 4112; *In re Brown,* 2009 Cal. App. Unpub. LEXIS 4131; *In re Vega,* 2009 Cal. App. Unpub. LEXIS 3673; *In re Brooks,* 2009 Cal. App. Unpub. LEXIS 2525; *In re Montgomery,* 2009 Cal. App. Unpub. LEXIS 2495; *In re Jacobson*, 2009 Cal. App. Unpub. LEXIS 2166; *In re Brown,* 2009 Cal. App. Unpub. LEXIS 1598; *In re Tarver,* 2009 Cal. App. Unpub. LEXIS 1458; *In re Wright,* 2009 Cal. App. Unpub. LEXIS 4305; *In re Kees,* 2009 Cal. App. Unpub. LEXIS 1396; *In re Orozco,* 2009 Cal. App. Unpub. LEXIS 915; *In re Davis,* 2009 Cal. App. Unpub. LEXIS 813; *In re Van Huynh,* 2009 Cal. App. Unpub. LEXIS 758; *In re Rockers,* 2009 Cal. App. Unpub. LEXIS 619; *In re Cobos,* 2009 Cal. App. Unpub. LEXIS 559; *In re Barker,* 2009 Cal. App. Unpub. LEXIS 504; *In re Viray,* 2009 Cal. App. Unpub. LEXIS 442; *In re Armstrong,* 2009 Cal. App. Unpub. LEXIS 252; *In re Cooper,* 2008 Cal. App. Unpub. LEXIS 9738.) This showing does not even take into account

the trial court decisions finding arbitrary gubernatorial action, or United States District Court cases that have also granted relief.

The evidence set forth above "strongly suggests that California parole authorities are losing sight of the fact that 'release on parole is the rule, rather than the exception.'" *In re Andrade,* 141 Cal.App.4th at 823 (conc. & disn. opn. of Pollak, J.), quoting *In re Smith,* 114 Cal.App.4th at p. 351; see also *In re Dannenberg,* 34 Cal.4th 1061, 1087 (2005) (While the Legislature provided "that uniform release dates would be a typical or common result for indeterminate life inmates ..., the Legislature provided an express 'public safety' exception"); *In re Lawrence,* 44 Cal. 4th at p. 1211 (noting "the statutory and regulatory mandate to normally grant parole to life prisoners who have committed murder"); see also *In re Smith,* 114 Cal.App.4th at p. 366 ("parole is the rule, rather than the exception"); *Scott I,* 119 Cal.App.4th at p. 891 (same); *In re Rico,* 171 Cal.App.4th at p. 670 (same).

The court in *In re Loresch,* 183 Cal.App.4th 150, set forth how the very high gubernatorial reversal rate of the few parole grants by the Board has required too many courts to overturn numerous such decisions for lack of some evidence to support them. *See Loresch,* 183 Cal.App.4th at 163-164, and elsewhere in this petition, where Gomez set forth numerous cases in the California courts of appeal alone where this has occurred, especially in the last 20 months. The *Loresch* court strongly suggested that the Governor's practice of parole reversal was at odds with the legislative mandate for the early setting of a parole date as a norm of practice within the parameters of the statute as defined by parole regulations and *In re*

*Lawrence, supra,* 44 Cal.4th 1181, and found that it threatened the rule of law. *Loresch,* 183 Cal.App.4th at 163-164.

The court in *In re Calderon,* 184 Cal.App.4th 670 agreed with *Loresch,* and added that it questioned whether the Governor based his decisions on the individualized consideration required by due process. *Id.* at 694. It further found that the disparity between the law and the parole authority's practice of parole denial was too great to continue to ignore: "It is increasingly impossible for the courts — or any informed person — to continue to believe the law governs the reality; which is why trial and appellate courts are with increasing frequency 'overruling' gubernatorial reversals of Board grants of parole[,]," and why — very uncommonly indicating the magnitude of the problem — they now feel the necessity to "implore" the Governor and his staff to "pause and reflect on the 'miniature constitutional crises' they foist upon the judiciary in these cases...." *Id.* at 695.

Such arbitrary disregard of the state's own laws regarding life and liberty constitutes a violation of federal due process. *See Hicks v. Oklahoma,* 447 U.S. 343 (1980) (state court's arbitrary deprivation of a life or liberty interest granted by state statute violates due process). Carlin's case illustrates the parole authority's illegal practice of arbitrarily disregarding the statutory framework for parole consideration by making the legislative exception the administrative rule in violation of due process. It also indicates the authority's rare-parole policy is a product of an institutional political bias that unlawfully deprives life prisoners of a fundamentally fair determination of their liberty interest in parole in violation of due process.

(b) If you did not exhaust your state remedies on Ground One, explain why:
N/A

## GROUND THREE:

THE GOVERNOR'S INVOCATION OF PENAL CODE SECTION
3041.2, ENACTED 18 YEARS AFTER CARLIN'S COMMITMENT
OFFENSE, TO REVERSE CARLIN'S PAROLE GRANT VIOLATES
THE EX POST FACTO CLAUSE OF THE FEDERAL
CONSTITUTION.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts
that support your claim.)

Carlin's offense occurred on June 10, 1980.

The California Constitution, article V, section 8, subdivision (b), gave

the Governor the power to reverse the Board's decision to grant parole to

convicted murderers. It was added in 1988 when the electorate passed

Proposition 89.

Governor Schwarzenegger retroactively applied article V, section 8,

subdivision (b), when he reversed the 2008 Board grant of parole to Carlin.

Absent Governor Schwarzenegger's reversal, Carlin would have

paroled pursuant to the Board's 2008 grant of parole. Retroactive

application of article V, section 8, subdivision (b) of the California

Constitution has increased Carlin's punishment, in violation of the

prohibition on ex post facto laws in the United States Constitution. *Garner*

*v. Jones* (2000) 529 U.S. 244.

(b) If you did not exhaust your state remedies on Ground One, explain why:
N/A

## GROUND FOUR:

### THE PRACTICE OF THE AUTHORITY HAS RENDERED ITS REGULATIONS UNCONSTITUTIONALLY VAGUE

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.) The facts set forth in Ground One, and the following facts support this claim.

The parole authority has also rendered its regulations unconstitutionally vague by distorting their application to the point where virtually all prisoners are deemed unsuitable for parole under them, even though the great majority of life prisoners could have a parole date set for them without unreasonable risk to public safety. A Board regulation valid on its face may become void for vagueness by the manner it is applied. See, e.g., *In re Lewis,* 172 Cal.App.4th 17, 28 (2009). For example, the evidence showed that the Board had found the unsuitability factor of an especially heinous, atrocious and cruel offense in 100% of the cases before it. *Id.* The Court of Appeal found that this did not render the Board's regulations vague for voidness because the regulations must be construed as a whole. As it stated: "The salient question remains: In finding an inmate unsuitable for parole, does the [authority] fail to demonstrate how all the applicable regulatory factors interrelate to support is conclusion that the inmate is currently dangerous to society?" *Id.* at 29. The authority failed to so demonstrate here, as it fails to do in almost all of its cases. Rather, it twisted its regulations to find unsuitability factors here by going beyond the reasonable language of the regulations to do so. A good example of such here was its finding of the unsuitability factor of a prior criminal record, when it should have found the suitability factor of minimal or no criminal

record of violence. This is but one example of how the authority
unreasonably interprets its own regulations to produce an arbitrary
deprivation of parole. *See, e.g., In re Andrade,* 141 Cal.App.4th at 815
(Board denial of parole was not based on "a reasonable interpretation of the
applicable regulation"; rather, "the Board is holding [the parole applicant]
to a higher standard than the standard required by California Code of
Regulations, title 15, section 2402").

 (b) If you did not exhaust your state remedies on Ground One, explain
why:        N/A

## GROUND FIVE:

### THE GOVERNOR'S REVERSAL OF CARLIN'S PAROLE GRANT VIOLATES CARLIN'S RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT

(a) Supporting facts (Do not argue or cite law. Just state the specific facts
that support your claim.) The facts set forth in Ground One, and the
following facts, support this claim.

The authority's repeated denial of parole to Carlin based on
unchangeable factors and unsupported conclusions that he presents an
unreasonable risk of danger if released, despite the undisputed record of
positive post-conviction rehabilitation and his diligent compliance with the
Board's recommendations one decade after another, converts his sentence
to one of life with only a mirage of a possibility of parole, in violation of the
Eighth Amendment's prohibition against cruel and unusual punishment.
*See, e.g., Whitelock v. Washington County* (Civ. No. 03-257-HA, June 16,
2004, U.S.D.C. Or.) [2004 U.S. Dist. LEXIS 13610 at *26-28].

(b) If you did not exhaust your state remedies on Ground One, explain why:
N/A

14.    Please answer these additional questions about the petition you are

filing:

(a)    Have all grounds for relief that you have raised in this petition

been presented to the highest state court having jurisdiction?

☑ Yes            ☐ No

(b)    If your answer is "No," state which grounds have not been so

presented and give your reason(s) for not presenting them:

15.    Have you previously filed any type of petition, application, or motion

in a federal court regarding the State's refusal to parole you **IN**

**2008**?

☐ Yes            ☑ No

Note:  Petitioner challenged in the United States District Court for the

Northern District of California, a 2003 Board denial of parole to him

as unsupported by any evidence of current dangerousness, and on

other grounds.  The District Court granted that petition and ordered

Carlin released on parole, with credit for unlawful days in custody

that would result in Carlin's discharge from parole.  *Carlin v. Wong,*

U.S.D.C. No. Dist. Cal., Case No. 3:06-cv-04145-SI.  The State

appealed that grant, and before any briefing on appeal, the Ninth

Circuit Court of Appeals, *Carlin v. Wong,* 9th Cir. Case No. 08-16831, stayed the District Court's order pending issuance of the mandate in *Hayward v. Marshall,* 603 F.3d 546 (9th Cir. 2010. The mandate in *Hayward* was issued on June 10, 2010. The proceedings in the Ninth Circuit in petitioner's case have not yet resumed.

16.  Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, concerning the refusal of the State to parole you **IN 2008** or the underlying judgment of conviction?

☐ Yes        x No

17.  Did any attorney represent you in any post-conviction proceeding in any court challenging the State's refusal to parole you?   For each such attorney state, if you know, the:

(a) Name of Attorney:             Margaret Littlefield*

(b) Address and Phone Number of Attorney:

> Law Offices of Michael Satris
> P. O. Box 337
> Bolinas, CA 94924
> Email: satris@sbcglobal.net

(c) Name of the court and proceeding in which the attorney

represented you.

> San Francisco Co. Superior Court
> Case No. 5995
>
> Court of Appeal
> First Appellate District, Div.
> Case No. A127919
>
> California Supreme Court
> Case No. S182521

*Assisted in the preparation of this petition, pro bono.

18. Do you have any future sentence to serve after you complete service of

the life term from which you seek parole?

☐ Yes          ☑ No

(a) If so, give name and location of court that imposed the other

sentence you will serve in the future: N/A

(b) Give the date the other sentence was imposed:          N/A

(c) Give the length of the other sentence:          N/A

(d) Have you filed, or do you plan to file, any petition that challenges

the execution of sentence to be served in the future?

N/A

19. TIMELINESS OF PETITION: To meet the one-year statute of

limitations as contained in 28 U.S.C. § 2244 (d) and explain why it

does not bar your petition, set forth for each denial of parole

challenged in this proceeding:

(a) The date the State parole authority's denial of parole became final:

August 22, 2008.

(b) The date you first filed a petition in State court challenging that

denial:

August 3, 2009

(c) The date the State Supreme Court finally denied that challenge:

June 30, 2010

Therefore, petitioner asks that the Court grant the following relief:

1. Order the State to release him from prison on parole, and to order that all days of unlawful incarceration to be applied to reduce Carlin's parole period.

2. Grant petitioner any other relief to which he may be entitled.

Petitioner further requests that the Court allow him to proceed in forma pauperis, application filed herewith – awaiting Warden's verification of assets and income which will be mailed to court as soon as it is completed –,[7] appoint him counsel,[8] and require the State to file an answer to his petition and to file with that answer the entire State Court records of his proceedings exhausting the challenge to the Governor's 2008 reversal of Carlin's parole grant, *see* pp. 3-5, *ante*, as well as the entire administrative record reviewed by the Governor when he reversed the parole grant in 2008.

N/A

Signature of Attorney (if any)

---

[7] Carlin filed in 2006 a challenge to a Board denial of parole in the United States District Court for the Northern District of California, Case No. 3:06-cv-04145-SI, in which he was granted relief, ordered released from prison, and ordered discharged from parole, and was appointed counsel by the Ninth Circuit Court of Appeals in the State's appeal of the trial court grant of relief. Case No. 08-16831. A copy of the district court's order appointing counsel for Carlin and stating he is financially unable to do retain counsel, is appended hereto.

[8] Margaret Littlefield, Attorney at Law, SBN 110938, was appointed to represent Carlin by the district court in case no. 3:06-cv-04145-SI. See n. 7, *ante*.

AO 241
(Rev. 12/04)
(Further Revised by Law Office of Michael Satris for Challenge to Parole Denial)                                      Page# 50

## NEXT FRIEND VERIFICATION

MARGARET LITTLEFIELD declares under penalty of perjury under the laws of the State of California.

I am an attorney, licensed to practice before all of the courts of the State of California, and before this Court, and am employed by the Law Offices of Michael Satris. In such capacity I have represented Carlin pro bono throughout the state court proceedings in the underlying challenge, and have prepared this petition for him with his knowledge and consent because of his inability to do so himself. I am verifying this petition instead of, and on behalf of Carlin, because he is housed at San Quentin State Prison, and to obtain his signature either by mail or during a legal visit would delay the filing of this petition to his detriment. I have read the foregoing petition and declare under penalty of perjury under the laws of the State of California and the United States of America that the contents of the petition are true and correct, based as they are on the State's own documents of Carlin's parole proceedings and those considered in those proceedings, and other records readily ascertainable and capable of judicial notice by this Court.

Executed at Bolinas, California on July 19, 2010.

Signature of Next Friend
Margaret Littlefield,
Attorney at Law


If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

ENDORSED

**F I L E D**
San Francisco County Superior Court

JAN 1 9 2010

GORDON/PARK-LI, Clerk
BY: _____
Deputy Clerk

1

2

3

4

5

6

7        **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8        **FOR THE CITY AND COUNTY OF SAN FRANCISCO**

9                   **Department No. 22**

10 | **IN THE MATTER OF THE APPLICATION** ) **WRIT NUMBER 5995**
11 |                          **OF** )
   |                             )
12 |               **JAMES CARLIN** )
   |                             )
13 |             **Petitioner,** )
   |                             ) **ORDER**
14 |    **FOR A WRIT OF HABEAS CORPUS** )
   |                             )

15

16       A petition for writ of habeas corpus has been received.

17       Inmate Robert Miranda ("Petitioner") petitions this Court

18   to review the Governor's reversal of the decision of the Board

19   of Parole Hearings ("Board") to grant Petitioner parole.

20       Petitioner currently is in custody in San Quentin State

21   Prison.  Petitioner was convicted of second degree murder with

22   use of a firearm in the Superior Court of California, County of

23   San Francisco in 1980.  The trial court sentenced Petitioner to

24   a term of 15 years to life plus two years.

25

1

1    On March 25, 2008, Petitioner appeared before the Board for
2  his thirteenth subsequent parole consideration hearing.  The
3  Board found Petitioner suitable for parole and that Petitioner
4  would not pose an unreasonable risk of danger to society or a
5  threat to public safety if released from prison.

6    On August 14, 2008, the Governor reversed the Board's
7  decision to grant parole.  The Governor found that Petitioner
8  would present a current unreasonable risk of danger to society
9
10 if released from prison due to the gravity of the commitment
11 offense, as well as Petitioner's lack of sufficient insight into
12 or remorse for the life offense, his inconsistent statements,
13 his minimization of his responsibility for his crimes, and his
14 prior criminal history.  (Appendix of Exhibits "Appendix" at
15 28).

16   On August 3, 2009, Petitioner filed a petition for writ of
17 habeas corpus with this Court.  In the petition for writ,
18 Petitioner complains that the Governor violated Petitioner's due
19 process rights because the Governor's decision was not supported
20 by any evidence showing Petitioner currently poses an
21 unreasonable risk to public safety.  Petitioner also contends
22 the following: the executive branch's policy and practice of
23 rarely granting parole to life-sentenced prisoners violates the
24 legislative framework under California Penal Code Section 3041;
25 the Governor's invocation of Penal Code Section 3041.2, enacted

1  18 years after Petitioner's commitment offense, to reverse
2  Petitioner's grant of parole, violates the ex post facto clause;
3  the executive branch's practice of regularly denying parole
4  violates the separation of powers doctrine; the practice of the
5  executive branch renders the parole regulations
6  unconstitutionally vague; and the Governor's reversal of
7  Petitioner's grant of parole violates Petitioner's right to be
8  free from cruel and unusual punishment. Each argument is
9  discussed below.

10  I.       **Factual Background**

11           **A.    The Commitment Offense**

12       The exhibits attached to the petition reveal the following
13  information about Petitioner's commitment crime. On June 10,
14  1980, a gun was stolen from Petitioner's room in the Golden
15  Eagle Hotel in San Francisco, where Petitioner had taken up
16  temporary residence while his wife and young daughter were at a
17  family wedding in New Jersey. Early in the morning that day,
18  Petitioner left his room at the hotel to buy a paper and some
19  cigarettes. He was approached by Curtis Jackson ("Jackson") and
20  Robert Evans ("Evans"), whom he did not know. They offered
21  Petitioner drugs. Petitioner declined but agreed to buy them a
22  small bottle of vodka. The men followed Petitioner back to his
23  room.

24       Petitioner was holding a gun for an acquaintance in an
25  attaché case in the hotel room. Jackson and Evans were playing

3

1 with the case. In order to get the men to leave his room,
2 Petitioner told them he would go out and buy them some heroin.

3 Later that day when Petitioner returned, he found that the
4 lock on his door had been broken and the attaché case with the
5 gun was missing. Petitioner called the police and told them he
6 believed that Jackson had stolen the gun. Petitioner, however,
7 had no proof and could not provide the serial number of the gun,
8 so the officers left. Petitioner decided to try to get the gun
9 back himself.

10 Several of Petitioner's acquaintances, Bob Migliorisi
11 ("Migliorisi"), Bernard Verrett ("Verrett"), and John Travis
12 ("Travis"), offered to help Petitioner retrieve the gun. Travis
13 stated that Evans and Jackson were dangerous, and related that
14 Travis had two guns of his own in his room. Petitioner, Travis,
15 Verrett, and Migliorisi went to Petitioner's room in the Golden
16 Eagle Hotel, where Petitioner and Verrett or Migliorisi each
17 took one of Travis's guns. All four men then left the Golden
18 Eagle Hotel and went to the Marconi Hotel to confront Evans.
19 Evans denied taking Petitioner's gun and said that Jackson had
20 stolen it. Evans joined the men as they returned to the Golden
21 Eagle Hotel to confront Jackson. Evans knocked on Jackson's
22 door because Jackson knew Evans and would let him in. After
23 Evans identified himself, Jackson opened the door.

24 The relation of the events that followed has changed
25 somewhat over the years. In some reports, Petitioner related

4

1  that Evans jumped away after Jackson opened the door. At that
2  point, Petitioner started to step into Jackson's room, but
3  thought he saw a gun in Jackson's hand. Petitioner, who already
4  had a gun drawn at his side, put the gun up but did not squeeze
5  the trigger. The gun went off accidentally, and Petitioner was
6  acting in self-defense. (*See e.g.* Appendix at 480, 165, 215).
7  One psychological evaluation from March 2007, however, provides
8  that Petitioner stated it was "no accident" that the gun went
9  off. (Appendix at 196). Moreover, at the 2008 parole
10 consideration hearing, Petitioner's attorney indicated that
11 Petitioner had come to believe that "he pulled the trigger and
12 killed the man," and Petitioner had "pretty much dropped" his
13 self-defense claim. (Appendix at 51-52). The end result was
14 that one shot hit Mr. Jackson in the chest, and Jackson died
15 almost instantaneously.

16     Over the years, Petitioner has stated that he is a non-
17 violent person and was in the wrong place at the wrong time at
18 the time of the homicide. (Appendix at 165, 196). Petitioner
19 has described the incident as "a tragic set of circumstances and
20 a million to one odds that I ended up in this situation. I
21 couldn't imagine myself ever being involved in this type of
22 thing because I am a totally non-violent person … the
23 circumstances of my being in the wrong place at the wrong time
24 are weird, to say the least" (Appendix at 481), and the
25 situation was "just a conjunction of circumstances that I was

5

1 | unable to overcome." (Appendix at 215). Petitioner was 33 or
2 | 34 years of age at the time of the shooting.

3 | On October 10, 1980, after rejecting the prosecutor's
4 | pretrial offer of manslaughter, a jury convicted Petitioner of
5 | second degree murder. Petitioner was sentenced to 15 years to
6 | life in prison, plus two years for use of the firearm.

7 | ## B. Petitioner's Prior Criminal Record

8 | Petitioner does not appear to have any substantial juvenile
9 | record. Petitioner suffered the following convictions as an
10 | adult. In 1966, at the age of 19, Petitioner was convicted of
11 | selling marijuana to undercover FBI agents. One report
12 | indicates he placed a loaded luger pistol to an undercover
13 | federal agents head and demanded money during this incident.
14 | (Appendix at 224). Petitioner believed that his arrest for this
15 | offense was based upon entrapment. (Appendix at 210). He was
16 | sentenced to two and one half years of state prison and was
17 | paroled the following year. Petitioner once described this
18 | incident as "involving a couple of joints of marijuana. He was
19 | sent to prison, although he had no prior record, because the
20 | judge wanted to make an example of him." (Appendix at 476).

21 | In 1968, at the age of 21, Petitioner was convicted of
22 | possession of hashish and placed on probation for four years.
23 | In 1969, at the age of 22, Petitioner was arrested for petty
24 | theft under the alias Lawrence Robert Braverman. According to
25 | Petitioner, he was arrested in a supermarket with a friend who

6

1  was stealing meat.  Petitioner gave the police the name Lawrence

2  Braverman as Petitioner had traded identification with that

3  person so that Mr. Braverman would appear to be of drinking age.

4  (Appendix at 476-477).  Petitioner received a 30-day suspended

5  jail sentence and a $50.00 fine.

6      In 1972, at the age of 25, Petitioner was arrested for

7  assault with a dangerous weapon and possession of marijuana

8  under the name Paul Vincent Ragaland.  One report indicates that

9  police ordered Petitioner to drop a shotgun during this

10  incident, and Petitioner complied only after directing the

11  firearm at the officer.  (Appendix 244). For this incident,

12  Petitioner also was charged with false imprisonment of a police

13  officer and providing false information to a police officer.

14  All of the charges were combined, and Petitioner received a

15  three-month suspended sentence.

16      In 1979, Petitioner was arrested for driving without a

17  license, expired vehicle registration, and receipt of stolen

18  property; all charges, however, were dismissed.  According to

19  Petitioner, he was in possession of a credit card his wife had

20  found.  (Appendix 477).  Petitioner was not arrested again until

21  the 1980 arrest for the commitment crime.

22      During this period of scattered criminal activity,

23  Petitioner also completed a BA degree (1971) from Rutgers

24  University and became a skilled union carpenter (1972).

25  //

7

1          **C. Petitioner's Evaluations**

2      Petitioner's prison reports and psychological evaluations

3   present the following selected information.

4                **1. Minimization of Responsibility for Actions**

5      Some evaluations reveal instances where Petitioner

6   minimized his responsibility for the actions that resulted in

7   the commitment offense. Petitioner's October 1980 Probation

8   Officer Report provides,

9
        The defendant attempts to set himself apart from and above
10      his associates at the Golden Eagle Hotel, yet, he
        voluntarily moved into that residence.  Like his
11      associates, whose lifestyle he criticized, he is also an
        ex-convict although he had been sentenced to State Prison
12      sixteen years earlier at the age of eighteen.  He minimizes
        the facts behind his imprisonment and his other arrests and
13      attempts to present himself as a victim of circumstances
        and the discretion of the Courts.
14
        Although the defendant describes himself as a non-violent
15      person, he was charged with the assault of a Federal
        officer in 1966 and was convicted of assault with an
16      official weapon in 1972.  Although witnesses indicate that
        the defendant stated he did not want any trouble prior to
17      killing the victim, the undersigned questions the
        defendant's surprise that someone was hurt, let alone
18      killed, in this case.  He armed himself with a weapon and,
        accompanied by another armed person plus several
19      companions, went to confront two men whom he suspected of
        stealing his gun after being told that these men were
20      dangerous.  He admits to having a loaded weapon at his side
        when the victim opened the door, and although he has
21      mentioned the possibility of self-defense as he thought the
        victim also had a gun, he denies pulling the trigger.
22
23      The defendant, who was open and pleasant with the
        undersigned and expressed himself in a clear and
24      intelligible manner, exhibited little emotion.  He appeared
        to have less remorse for his actions than for the
25      consequences thereof.  Although the undersigned does not
        believe that the defendant had premeditated the murder, he

                                    8

1
2
3

was not an innocent person being led astray by his associates and surrounding but, rather, was an active participant and leader in a potentially dangerous situation involving loaded weapons which, unfortunately, materialized to fruition resulting in the loss of human life.

4

(Appendix at 487).

5
6
7
8
9
10

In a February 2000 psychological evaluation, Petitioner relayed to the evaluator that he was a non-violent person who was never engaged in violent incidents before the homicide. (Appendix 226). The evaluator noted, "[w]hen confronted with prior history of [carrying] guns and shot guns, [Petitioner] minimized it as if never happened." (Appendix 226).

11
12

The evaluator from Petitioner's March 2005 psychological evaluation provided,

13
14
15
16
17

The fact that [Petitioner] minimized his agency in shooting the victim ("the gun went off") and the fact that he minimized his flight from the scene by stating that he was not sure that a bullet in the chest had actually killed his victim suggest that he has not come to terms either with the gravity of his actions or with a sense of personal responsibility for them.

18
19
20
21
22
23
24
25

(Appendix at 214-215). Petitioner told the March 2005 evaluator that his "only real regret is that I killed a guy. It is just something that I don't really believe in … that kind of violence. There shouldn't be any reason unless you're defending yourself. That day was just a conjunction of circumstances that I was unable to overcome." (Appendix at 215). The evaluator noted that "[t]he fact that [Petitioner] followed up his expression of 'regret' for killing the victim by emphasizing 'circumstances' that he was 'unable to overcome' suggests a

9

1  disavowal of his personal responsibility for his actions."
2  (Appendix at 215).

### 2. **Petitioner's Remorse and Insight**

4   Some psychological evaluations reveal instances where
5  Petitioner has not demonstrated sufficient remorse for or
6  insight into the causative circumstances of the commitment
7  offense. The evaluator from the February 2000 psychological
8  evaluation provided that Petitioner "still does not appear to
9  have closely examined what happened that led him to his
10 incarceration for this offense. He seems to feel that he had no
11 intentions of it happening that way, but his action led up to
12 potential gun battle. So part of him does not examine his
13 actions closely with a view to change." (Appendix at 228).
14

15  The evaluator from Petitioner's March 2005 psychological
16 evaluation provided that some of Petitioner's statements
17 suggested that Petitioner was "avoiding looking at the personal
18 factors which caused him to go confront his victim, rather than
19 to choose a less confrontational or violent path." (Appendix
20 214). Moreover, when the March 2005 evaluator asked Petitioner
21 the name of his victim, Petitioner stated he did not recall.
22 (Appendix at 215). The evaluator stated that the fact that
23 Petitioner does not recall the victim's name suggests that he
24 has avoided processing details of the crime. (Appendix at 215).
25 The March 2005 evaluator further provided,

1    [Petitioner] ultimately stated that during the last year he
     had gained no insight into the causes of his crime. He
2    stated "you think someone should fret over [the crime] …
     for how long? I thought about it to where I know what it
3    was … I knew I had opportunities to leave." He later
     stated, "How much can you think about anything? You end up
4    like Camus … You could think a lot but you gotta have
     someone to direct you … all the little programs here and
5    books that point you in that direction seem to be a scam or
     superficial … in order to help people you would have to
6    have psychotherapy or psychoanalysis and word association."

7
     **[The significance of the above is that [Petitioner] has**
8    **avoided any further understanding of the psychological**
     **causes of his crime by devaluing all available means of**
9    **further exploration. In addition, he was quite overt about**
     **the fact that he wished to limit how much he thought about**
10   **it.]**

11   (Appendix at 216-217) (emphasis in original). The March 2005

12   evaluator concluded by stating that Petitioner, while

13   intelligent,

14
     [H]as resisted exploring his instant offense and, because
15   of this, his insight into the offense and its underlying
     causes is limited. The evidence for this opinion is
16   discussed above and includes the fact that [Petitioner] has
     avoided looking deeply at his motivations; that he has
17   avoided coming to terms with the gravity of his actions;
     that he has disavowed personal responsibility; that he has
18   openly announced his idea that one should not "dwell" on
     one's crime; and that he does not recall his victim's name.
19

20   (Appendix at 217).

21   The evaluator from Petitioner's October 2005 psychological

22   evaluation provided that Petitioner described feelings of

23   remorse for his crime by stating that a person had died and

24   "that was never good," but that Petitioner continued to put

25   forward a version of the events that seems implausible.


                                   11

1 Therefore, the evaluator found it difficult to assess

2 Petitioner's understanding of the causal factors of the crime

3 and found Petitioner's version of the events portrayed

4 Petitioner as "an unwitting actor in a criminal drama that was,

5 more or less, out of his control." (Appendix at 209). Further,

6 Petitioner felt there "were much worse offenses than his" on the

7 spectrum of crimes. (Appendix at 209). The evaluator also

8 stated,

9

10     [Petitioner] has resisted exploring his instant offense
       other than to put forth a version that largely absolves him

11     of full responsibility for the killing. In his system of
       values, it would seem that certain types of violence,

12     including some murders, are ego-syntonic. [Petitioner] has
       not fully explored the relationship between the crime and

13     this aspect of his own personal psychology.

14 (Appendix 211).

15                 **3. Petitioner's Projected Likelihood of Future
                             Violence**

16

17     Some psychological evaluations reveal uncertainty about

18 Petitioner's likelihood for future violence. The evaluator from

19 Petitioner's March 2007 psychological evaluation provided that

20 using Petitioner's historical factors to predict future violence

21 would place Petitioner in the *moderate range* for his propensity

22 to engage in future violence. (Appendix 198). Although

23 Petitioner's overall risk for future violence, when all factors

24 are considered, is in "the low range when compared to similar

25 violent inmates." (Appendix at 198).

12

1      But, the evaluator for Petitioner's previous psychological

2   evaluation, in October 2005, provided that while Petitioner,

3       [D]oes not have a protracted history of offenses involving
4       violence, his account of his commitment offense suggests
        that he feels entitled to put forth a version of the events
5       that is not entirely consistent, and seems lacking in
        veracity.  One cannot help but gain the impression that
6       there is more to the story that [Petitioner] is not
        choosing to tell.  It is difficult to make statements about
7       [Petitioner's] level of dangerousness without knowing the
        whole story.  Too many questions remain to make an
8       assessment based on the information provided by
        [Petitioner], or provided in his records.
9
    (Appendix at 210).  The evaluator further stated,
10
11      [U]ntil [Petitioner] is more forthcoming, it is not
        possible to assess the likelihood that he might return to a
12      social environment that accepts the use of killing in
        certain situations, or against targeted individuals.
13
    (Appendix at 211).
14
                    **D. 2008 Parole Grant**
15
        On March 25, 2008, the Board found Petitioner suitable for
16
    parole and that Petitioner would not pose an unreasonable public
17
    safety risk if released.  (Appendix at 141).  The evidence that
18
19  the Board considered included that, while the offense was

20  carried out in a manner demonstrating callous disregard for

21  public safety and for a trivial motive, Petitioner had no

22  juvenile record of assaultive behavior, possessed a stable

23  social history, and Petitioner has enhanced his ability to

24  function within the law through educational and self-help

25  programs.  (Appendix at 142-144).  Further, Petitioner's

                            13

1 maturation and advanced age, his realistic parole plans,

2 Petitioner's relapse prevention plan, and his minimal

3 institutional disciplinary history support release. (Appendix

4 at 144-146). The Board also found that Petitioner "shows signs

5 of remorse," understands the nature and magnitude of the

6 commitment offense, and has insight. (Appendix at 146, 150).

7 **E. Governor's Reversal Decision**

8

9 On August 14, 2008, the Governor reversed the Board's 2008

10 parole grant. (Appendix at 24-28). The Governor based his

11 decision on the nature and circumstances of the life offense and

12 the gravity of that crime. (Appendix at 26). The Governor also

13 based his decision upon Petitioner's minimization of

14 responsibility for the offense, his lack of remorse,

15 Petitioner's inconsistent statements regarding the events of the

16 commitment offense and whether Petitioner acted in self-defense,

17 and Petitioner's criminal history before the commitment offense.

18 (Appendix 26-28). The Governor summarized his reasoning as

19 follows:

20
> At age 61 now, after being incarcerated for more than 28
21 > years, [Petitioner] made some credible gains in prison.
> But given the current record before me, and after carefully
22 > considering the very same factors the Board must consider,
> I find that the gravity of the murder committed by
23 > [Petitioner], along with his lack of sufficient insight
> into or remorse for the life offense, his inconsistent
24 > statements, his minimization of his responsibility for his
> crimes, and his prior criminal history, presently outweigh
25 > the positive factors. Accordingly, because I believe his
> release from prison would pose an unreasonable risk of

14

1    danger to society at this time, I REVERSE the Board's 2008
     decision to grant parole to [Petitioner].

2

3    (Appendix at 28).

4    **II.    Relevant Law**

5    The Governor may review Board decisions granting parole and

6    can affirm, modify, or reverse them. (*Cal. Const.*, art. V, § 8,

7    subd. (b); *Cal. Pen. Code* § 3041.2). While the Governor's

8    decision must be based on the same factors that the Board is

9    required to consider, the Governor independently reviews the

10   evidence and may give it different weight and resolve any

11   conflicts. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 676-677).

12   This means the Governor may be "more stringent or cautious" in

13   determining whether an inmate poses an unreasonable risk to

14   public safety. (*Id.* at 686). Due process requires only that

15   "some evidence" relevant to the factors listed in section 2402,

16

17   subdivision (c) support the Governor's parole reversal. (*Id.* at

18   676-677).

19   The relevant factors are enumerated in section 2402 of

20   title 15 of the California Administrative Code. Section 2402 of

21   that code specifies that the following circumstances each tend

22   to indicate unsuitability for release on parole: (1) the

23   prisoner committed the offense in an especially heinous,

24   atrocious, or cruel manner; (2) the prisoner possesses a

25   previous record of violence; (3) the prisoner has an unstable

     social history; (4) the prisoner previously has sexually

15

1   assaulted another individual in a sadistic manner; (5) the

2   prisoner has a lengthy history of severe mental problems related

3   to the offense; and (6) the prisoner has engaged in serious

4   misconduct while in prison. (15 *Admin. Code* § 2402, subd. (c)).

5       The circumstances tending to show parole suitability

6   include: (1) the prisoner does not possess a prior record of

7   committing crimes with a potential of personal harm to victims;

8   (2) the prisoner has a reasonably stable social history; (3) the

9   prisoner has shown signs of remorse; (4) the prisoner committed

10  the crime as the result of significant stress in his or her

11  life; (5) the prisoner suffered from Battered Woman Syndrome and

12  the committing crime was a consequence of that victimization;

13  (6) the prisoner lacks any significant history of violent crime;

14  (7) the prisoner is of an age that reduces the probability of

15  recidivism; (8) the prisoner has made realistic plans for

16  release or has developed marketable skills that can be put to

17  use upon release; and (9) the prisoner has participated in

18  institutional activities that indicate an enhanced ability to

19  function within the law upon release. (15 *Admin. Code* § 2402,

20  subd. (d)).

21      The aforementioned factors are "general guidelines" only.

22  (15 *Admin. Code* § 2402, subds. (c), (d)). The Board or Governor

23  is expected to consider "all relevant, reliable information

24  available." (15 *Admin. Code* § 2402, subd. (b)). Circumstances

25  that may not firmly establish unsuitability for parole standing

16

1  alone may contribute to a pattern that supports a finding of
2  unsuitability. (15 *Admin. Code* § 2402, subd. (b)).

3      "Regardless of the length of time served, a life prisoner
4  shall be found unsuitable for and denied parole if in the
5  judgment of the panel the prisoner will pose an unreasonable
6  risk of danger to society if released from prison." (15 *Admin.*
7  *Code* § 2402, subd. (a)). Because the Governor must base his
8  decision on the same factors that the Board is required to
9  consider, it follows the Governor may also deny parole on this
10 basis. (*Rosenkrantz*, *supra*, 29 Cal.4th at 676-677).

11     The California Supreme Court recently clarified the
12 determinative question on review of a parole denial. (*In re*
13 *Lawrence* (2008) 44 Cal.4th 1181). The Court stated:

14     [T]he relevant inquiry is whether the circumstances of the
15     commitment offense, when considered in light of other facts
       in the record, are such that they continue to be predictive
16     of current dangerousness many years after commission of the
       offense. This inquiry is, by necessity and by statutory
17     mandate, an individualized one, and cannot be undertaken
       simply by examining the circumstances of the crime in
18     isolation, without consideration of the passage of time or
       the attendant changes in the inmate's psychological or
19     mental attitude.

20 (*Id.* at 1221). The Court stressed, however, that its
21 clarification of the "some evidence" standard does not alter its
22 previous decisions that recognized that the determinations of
23 the Board or Governor are still entitled to deference. (*Id.* at
24 1191, n. 2). The Court summarized its opinion by restating the
25 standard a court should apply when reviewing denials of parole:

17

1    In sum, the Board or the Governor may base a denial-of-
     parole decision upon the circumstances of the offense, or
2    upon other immutable facts such as an inmate's criminal
     history, but some evidence will support such reliance only
3    if those facts support the ultimate conclusion that an
     inmate *continues* to pose an unreasonable risk to public
4    safety. (Regs., § 2281, subd. (a).) Accordingly, the
     relevant inquiry for a reviewing court is not merely
5    whether an inmate's crime was especially callous, or
     shockingly vicious or lethal, but whether the identified
6    facts are probative to the central issue of current
     dangerousness when considered in light of the full record
7    before the Board or the Governor.

8
     (*Id.* at 1221). Accordingly, the issue presented is whether some
9
     credible evidence supports the Governor's conclusion that the
10
     gravity of Petitioner's crime, Petitioner's lack of full insight
11
12   into or remorse for the life offense, Petitioner's inconsistent
13   statements, his minimization of responsibility for the crimes,
14   and Petitioner's prior criminal history indicates Petitioner
15   poses a current danger to public safety.

16        The court does not have to review the entire record, but
17   may conduct such review as is necessary to determine whether any
18   evidence in the record supports the denial. (*In re Roderick*
19   (2007) 154 Cal.App.4th 242, 263). Whenever "a modicum of
20   evidence" relevant to the enumerated factors supports a parole
21   denial, the reviewing court must affirm the decision.
22   (*Rosenkrantz*, *supra*, 29 Cal.4th at 677). If some evidence
23   supports the parole denial, "[i]t is irrelevant that a court
24   might determine that evidence in the record tending to establish
25

18

1 suitability for parole far outweighs evidence demonstrating
2 unsuitability for parole." (*Id.*).

3 **III.   The Governor's Decision is Supported by Some
            Evidence that Petitioner Currently Presents an
4            Unreasonable Risk of Danger to Society or Threat
            to Public Safety**
5

6      In the petition, Petitioner complains that the Governor's
7 decision was arbitrary and capricious because there is no
8 evidence in the record that Petitioner currently poses an
9 unreasonable safety risk. As will be explained further, some
10 evidence supports the Governor's decision that Petitioner remains
11 a threat to public safety due to the factors he enumerated.

12     The Governor found Petitioner's commitment offense to be
13 "especially atrocious." (Appendix at 26). An inmate may be
14 found unsuitable for parole if the crime was committed in an
15 especially heinous, atrocious, or cruel manner. (15 *Admin. Code*
16 § 2402, subd. (c)(1)). This might include circumstances where:
17 (A) multiple victims were attacked in the same or separate
18 incidents; (B) the offense was carried out in a dispassionate
19 and calculated manner (i.e. an execution-style murder); (C) the
20 victim was abused, defiled, or mutilated; (D) the inmate
21 demonstrated an exceptionally callous disregard for human
22 suffering; and (E) the motive is inexplicable or very trivial in
23 relation to the offense. (15 *Admin. Code* § 2402, subd.
24 (c)(1)(A)-(E)). Here, the commitment offense was carried out in
25

19

1    a dispassionate and calculated manner and the motive was very
2    trivial in relation to the offense.

3    The exhibits attached to the petition show that, despite
4    his knowledge that the victim was a dangerous person who
5    harbored weapons, Petitioner led a group of armed men to
6    confront the victim about a firearm taken from Petitioner's
7    hotel room. (Appendix at 478, 480). Petitioner drew his
8    firearm even before the victim opened the door to his hotel
9    room. (Appendix at 480). When the victim opened the door,
10   Petitioner shot him. (Appendix at 480).

11   Even assuming Petitioner acted either accidentally or in
12   perceived self-defense, Petitioner's actions before the victim
13   opened the door showed extreme dispassion and a certain degree
14   of calculation. Petitioner clearly created a volatile situation
15   by leading a group of armed men to confront a dangerous person
16   over a firearm. Moreover, Petitioner obviously knew he was
17   entering a situation where violence or loss of life was
18   probable, as evidenced by the fact that Petitioner drew his
19   firearm before the victim even opened the door. Further,
20   Petitioner's motives for his actions, retrieval of a firearm
21   that did not belong to him and defending his "macho" status,
22   were trivial in relation to the offense. (Appendix at 480,
23   214). Because "some evidence" in the record supports the
24   Governor's finding that the commitment offense was particularly
25   egregious (*Rosenkrantz*, *supra*, 29 Cal.4th at 676-677), the

20

1 | Governor properly considered the commitment offense as a factor
2 | in denying parole. (15 *Admin. Code* § 2402, subd. (c)(1)).

3 |     Although the Governor noted that the nature of the
4 | commitment offense was especially heinous, the Governor also
5 | made clear that he was reversing the Board's 2008 decision to
6 | grant parole because of Petitioner's lack of full insight into
7 | or remorse for the life offense, Petitioner's inconsistent
8 | statements, his minimization of responsibility for the crimes,
9 | and Petitioner's prior criminal history. The combination of
10 | these items provides some evidence that Petitioner currently
11 | remains a threat to public safety if released on parole.

12 |     Petitioner's criminal history prior to the commitment
13 | offense does contain violence. More importantly, Petitioner
14 | minimized the severity of his former crimes and seemed to
15 | possess the attitude that he was not responsible for his actions
16 | and/or that the authorities were out to get him. In 1996, at
17 | the age of 19, Petitioner was convicted of selling marijuana to
18 | undercover FBI agents in an incident wherein Petitioner placed a
19 | loaded pistol to an undercover federal agent's head. (Appendix
20 | at 224). At some point, Petitioner stated he believed this
21 | arrest was based upon entrapment. (Appendix at 210).
22 | Petitioner described the incident as just "involving a couple of
23 | joints of marijuana. He was sent to prison, although he had not
24 | prior record, because the judge wanted to make an example of
25 | him." (Appendix at 476).

21

1    In 1969, at the age of 22, Petitioner was arrested for
2  petty theft under a false name. Petitioner's excuse for this
3  offense was that he was arrested in a supermarket with a friend
4  who was stealing meat. Petitioner gave the police the false
5  name because Petitioner had traded identification with his
6  friend so his friend would appear to be of drinking age.
7  (Appendix at 476-477).

8    Again, in 1972, at the age of 25, Petitioner was arrested
9  under another false name for assault with a dangerous weapon and
10  possession of marijuana. Based upon the facts of this incident
11  Petitioner was also charged with false imprisonment of a police
12  officer and providing false information. In this confrontation,
13  Petitioner directed a shotgun at police officers and had to be
14  ordered to drop the weapon. (Appendix at 244).

15    When Petitioner was arrested for receipt of stolen property
16  in 1979 (all charges were dismissed), Petitioner claimed he was
17  in possession of a credit card his wife had found. (Appendix at
18  477).

19    The foregoing criminal history shows that Petitioner
20  possessed a demonstrated record of violence with firearms before
21  the commitment offense. More importantly, Petitioner seemed to
22  think that most of the foregoing offenses were not his fault and
23  derived from circumstances that were out of his control. For
24  example, in his February 2000 psychological evaluation,
25  Petitioner related to the evaluator that he was a non-violent

22

1 person who had never engaged in violent incidents before the

2 homicide.   (Appendix at 226).  The evaluator noted, "when

3 confronted with prior history of [carrying] guns and shot guns,

4 [Petitioner] minimized it as if never happened."  (Appendix at

5 226).  The circumstances of the commitment offense are no

6 different.

7    Petitioner's October 1980 Probation Officer Report provides

8 that Petitioner,

9     [M]inimizes the facts behind his imprisonment and his other
      arrests and attempts to present himself as a victim of
10    circumstances and the discretion of the Courts.

11    Although the defendant describes himself as a non-violent
      person, he was charged with the assault of a Federal
12    officer in 1966 and was convicted of assault with an
      official weapon in 1972.  Although witnesses indicate that
13    the defendant stated he did not want any trouble prior to
      killing the victim, the undersigned questions the
14    defendant's surprise that someone was hurt, let alone
      killed, in this case.  He armed himself with a weapon and,
15    accompanied by another armed person plus several
      companions, went to confront two men whom he suspected of
16    stealing his gun after being told that these men were
      dangerous.  He admits to having a loaded weapon at his side
17    when the victim opened the door, and although he has
      mentioned the possibility of self-defense as he thought the
18    victim also had a gun, he denies pulling the trigger.
19

20    The defendant … appeared to have less remorse for his
      actions than for the consequences thereof.  Although the
21    undersigned does not believe that the defendant had
      premeditated the murder, he was not an innocent person
22    being led astray by his associates and surrounding but,
      rather, was an active participant and leader in a
23    potentially dangerous situation involving loaded weapons
      which, unfortunately, materialized to fruition resulting in
24    the loss of human life.

25

23

1    (Appendix at 487). The problem here is that some evidence in

2    the record shows that, like his past criminal conduct,

3    Petitioner continues to fail to take responsibility for or gain

4    insight into his actions on the day of the commitment offense.

5    Failure to come to terms with the circumstances of the

6    commitment offense may constitute some evidence that an inmate

7    remains a threat to society. (*In re Shaputis* (2008) 44 Cal.4th

8    1241).

9

10   In *Shaputis*, petitioner was convicted of the second degree

11   murder of his wife and was sentenced to an indeterminate term of

12   imprisonment of 15 years to life in prison, and an additional

13   two years because of his use of a firearm in the commission of

     the offense. (*Id.* at 1245). In 2006, the Board found Shaputis

14   eligible for parole, but the Governor reversed the Board's

15   decision, concluding that Shaputis constituted a threat to

16   public safety. (*Id.*). Shaputis filed a petition for writ of

17   habeas corpus, challenging the Governor's decision. (*Id.*) The

18   California Supreme Court ultimately denied the petition for

19   writ, finding that "some evidence in the record supports the

20   Governor's conclusion that petitioner remains a threat to public

21   safety in that he has failed to take responsibility for the

22   murder of his wife, and despite years of rehabilitative

23   programming and participation in substance abuse programs, has

24   failed to gain insight into his previous violent behavior."

25   (*Id.* at 1246; 1255). The Court concluded that the gravity of

24

1   the commitment offense and petitioner's current attitude toward

2   the crime constituted "some evidence" that petitioner remained a

3   current threat to public safety, despite the fact that multiple

4   psychologists described petitioner as posing a low degree of

5   threat to the public. (*Id.* at 1246; 1249-1251).

6       Similarly, in this case, certain evidence shows Petitioner

7   has failed to take responsibility for his actions in the

8   homicide and has failed to gain insight into his previously

9   violent behavior. The February 2000 psychological evaluator

10   provided that Petitioner "still does not appear to have closely

11   examined what happened that led him to his incarceration for

12   this offense. He seems to feel that he had no intentions of it

13   happening that way, but his actions led up to a potential gun

14

15   battle. *So part of him does not examine his actions closely*

16   *with a view to change."* (Appendix at 228) (emphasis added).

17       In addition, an evaluator found, as recently as March 2005,

18   that,

19       The fact that [Petitioner] [in 2005] minimized his agency
        in shooting the victim ("the gun went off") and the fact

20       that he minimized his flight from the scene by stating that
        he was not sure that a bullet in the chest had actually

21       killed his victim suggest that he has not come to terms
        either with the gravity of his actions or with a sense of

22       personal responsibility for them.

23   (Appendix at 214-215). Further, Petitioner told this evaluator

24   that the day of the commitment offense "was just a conjunction

25   of circumstances that I was unable to overcome." (Appendix at

1   215). This evaluator also noted that "[t]he fact that

2   [Petitioner] followed up his expression of 'regret' for killing

3   the victim by emphasizing 'circumstances' that he was 'unable to

4   overcome' suggests a disavowal of his personal responsibility

5   for his actions." (Appendix at 215).

6       The evaluator also provided that some of Petitioner's

7   statements suggested that Petitioner was "avoiding looking at

8   the personal factors which caused him to go confront his victim,

9   rather than to choose a less confrontational or violent path."

10  (Appendix 214). Moreover, when the March 2005 evaluator asked

11  Petitioner the name of his victim, Petitioner stated he did not

12  recall, which the evaluator suggests means that Petitioner has

13  avoided processing details of the crime. (Appendix at 215). The

14  March 2005 evaluator concluded by stating that Petitioner, while

15  intelligent,

16

17      [H]as resisted exploring his instant offense and, because
        of this, his insight into the offense and its underlying
18      causes is limited. The evidence for this opinion is
        discussed above and includes the fact that [Petitioner] has
19      avoided looking deeply at his motivations; that he has
        avoided coming to terms with the gravity of his actions;
20      that he has disavowed personal responsibility; that he has
        openly announced his idea that one should not "dwell" on
21      one's crime; and that he does not recall his victim's name.

22  (Appendix at 217).

23      This recent March 2005 psychological evaluation taken in

24  isolation may have been just an aberration for Petitioner. But,

25  an October 2005 evaluation from a different author echoed

26

1  similar concerns, bolstering the evidence that Petitioner has

2  not taken full responsibility for the crime or gained insight

3  into the circumstances of the offense. The October 2005

4  evaluator found that Petitioner continued to put forward a

5  version of the events that seemed implausible and portrayed

6  Petitioner as "an unwitting actor in a criminal drama that was,

7  more or less, out of his control." (Appendix at 209). This

8  evaluator stated,

9

10      [Petitioner] has resisted exploring his instant offense
        other than to put forth a version that largely absolves him
11      of full responsibility for the killing. In his system of
        values, it would seem that certain types of violence,
12      including some murders, are ego-syntonic. [Petitioner] has
        not fully explored the relationship between the crime and
13      this aspect of his own personal psychology.

14  (Appendix at 211). Importantly, the evaluator further stated

15  that Petitioner's,

16      [A]ccount of his commitment offense suggests that he feels
        entitled to put forth a version of the events that is not
17      entirely consistent, and seems lacking in veracity. One
        cannot help but gain the impression that there is more to
18      the story that [Petitioner] is not choosing to tell. It is
        difficult to make statements about [Petitioner's] level of
19      dangerousness without knowing the whole story. Too many
        questions remain to make an assessment based on the
20      information provided by [Petitioner], or provided in his
        records.
21

22  (Appendix at 210). The evaluator further stated,

23      [U]ntil [Petitioner] is more forthcoming, it is not
        possible to assess the likelihood that he might return to a
24      social environment that accepts the use of killing in
        certain situations, or against targeted individuals.
25

    (Appendix at 211).

27

1    The foregoing constitutes some evidence in the record

2    supporting the Governor's decision that Petitioner remains a

3    danger to public safety. The ultimate concern here is that

4    Petitioner has a long history of minimizing responsibility for

5    his dangerous conduct and blaming such conduct on external

6    factors. Moreover, evidence in the record shows that Petitioner

7    continues to maintain this practice and has not gained insight

8    into his previous violent conduct. This being the case, it

9    raises the question of how Petitioner will react when he once

10   again finds himself in a situation in the community where the

11   circumstances are "out of his control."

12

13   As explained, this Court is limited in its review. It

14   cannot grant relief to the Petitioner simply because it may

15   disagree with the Governor's decision. Because the Governor may

16   be "more stringent or cautious" in determining whether an inmate

17   poses an unreasonable risk to public safety, this Court

18   concludes that the nature of Petitioner's commitment offense,

19   and the various reports and evaluations regarding Petitioner's

20   minimization of responsibility for his actions and his lack of

21   full insight into and remorse for the commitment offense,

22   constitutes some evidence that Petitioner remains a danger to

23   public safety.

24

25   Because there is some evidence in the record to support the

Governor's conclusion that Petitioner remains a danger to public

1  safety, Petitioner is not entitled to writ relief on this

2  ground.

3  **IV.    The Governor's policy and practice of rarely
4          granting parole to life-sentenced prisoners does
          not violate the legislative framework under
5          California Penal Code Section 3041.**

6      Petitioner next contends that the Governor has a policy and

7  practice of rarely granting parole to life-sentenced prisoners,

8  and such policy violates the legislative framework under Penal

9  Code Section 3041 that carries a mandate to normally parole

10 murderers. Penal Code Section 3041 provides that a parole date

11 shall normally be set for life prisoners. (*Cal. Pen. Code* §

12 3041(a)).  Although Petitioner is correct that Penal Code

13 Section 3041(a) indicates a parole release date normally shall

14 be set, that same statute makes it clear the prisoner need not

15 be released until it is determined that the prisoner is

16 suitable.  (*Cal. Pen. Code* § 3041(b) (a release date shall be

17 set unless it is determined that consideration of public safety

18 requires a more lengthy period of incarceration for the

19 prisoner)).

20     Because the statute allows the Governor to take into

21 account public safety and suitability before releasing a

22 prisoner, the Governor's alleged policy and practice of rarely

23 granting parole to prisoners he finds unsuitable is not contrary

24 to the legislative framework of Section 3041.

25 //

29

1    **V.     The Governor's invocation of Penal Code Section
            3041.2, enacted 18 years after Petitioner's
2           commitment offense, to reverse Petitioner's grant
            of parole, does not violate the ex post facto
3           clause pursuant to California authorities.**

4       Petitioner next argues that the Governor's invocation of

5    Penal Code Section 3041.2, enacted 18 years after Petitioner's

6    commitment offense, to reverse Petitioner's grant of parole,

7    violates the ex post facto clause of the federal constitution.

8    Petitioner admits, however, that the California Supreme Court
9
     previously rejected this argument in *In re Rosenkrantz, supra*,
10
     29 Cal.4th 616, and this Court is bound by that decision.
11
12   Petitioner raises the issue here only to preserve it for federal

13   court.

14   **VI.    The executive branch's practice of rarely granting
            parole does not violate the separation of powers
15          doctrine.**

16      Petitioner also contends that the Board's practice of

17   regularly denying parole violates the doctrine of the separation

18   of powers. Again, Section 3041 gives the executive branch the

19   ability to deny parole for inmates who pose a public safety

20   concern.  (*Cal. Pen. Code* § 3041(b)).  The executive branch does

21   not violate the separation of powers doctrine by exercising a
22
     power provided to it by statute.
23
        Moreover, in Petitioner's case the Board granted parole.
24
     Therefore, to the extent Petitioner contends the Board acts
25

1 unlawfully by regularly denying parole, it is doubtful

2 Petitioner has standing to make that argument here.

3 **VII.** **The practice of the executive branch does not**
4 **render the parole regulations unconstitutionally**
**vague.**

5 Petitioner further contends that the Board and Governor

6 have rendered the parole regulations unconstitutionally vague by

7 distorting their application to the point where virtually all

8 prisoners are deemed unsuitable for parole. (*See In re Lewis*

9 (2009) 172 Cal.App.4th 13, 29 (in determining whether the parole
10
11 regulations are unconstitutionally vague as applied, the salient
12 question is whether the parole authority fails to demonstrate
13 how the applicable regulatory factors interrelate to support the
14 conclusion that the inmate currently is dangerous to society)).
15 But, as detailed above, the Governor in this case described
16 specific interrelated factors, based upon the parole
17 regulations, to support his conclusion that Petitioner remains
18 dangerous to society. Such a particularlized approach defeats
19 Petitioner's argument that he was denied parole in a formulaic
20 fashion.

21 **VIII.** **The Governor's reversal of Petitioner's grant of**
22 **parole does not violate Petitioner's right to be**
**free from cruel and unusual punishment.**

23 Petitioner contends that the repeated denial of his parole
24 based upon unchangeable factors and unsupported conclusions
25 converts his sentence to one of life with "only a mirage of a

31

1   possibility of parole," in violation of the Eight Amendment's

2   prohibition against cruel and unusual punishment. But, many of

3   the factors the Governor used to deny parole, such as

4   Petitioner's failure to take responsibility for his actions and

5   lack of insight, are not unchangeable. Further, the Governor's

6   conclusions are not unsupported; rather, they are supported by

7   some evidence in the record. Therefore, the basis of

8   Petitioner's Eighth Amendment argument, that he is continuously

9   denied parole based upon unchangeable factors and unsupported

10   conclusions, is flawed. Accordingly, the Eighth Amendment claim

11   fails.

12   **IX.**     **Conclusion**

13     For the foregoing reasons, this Court DENIES the petition

14   for writ of habeas corpus.

15     IT IS SO ORDERED.

16

17

18   Dated: _1-18-10_

19                   Judge of the Superior Court

20

21

22

23

24

25

32

## IN THE SUPERIOR COURT
## OF THE CITY AND COUNTY OF SAN FRANCISCO

### NO: 5995

### CERTIFICATION OF SERVICE BY MAIL

I, THE UNDERSIGNED, CERTIFY: THAT I AM A DEPUTY CLERK OF THE SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO, STATE OF CALIFORNIA, AND NOT A PARTY TO THE WITHIN CAUSE; THAT ON THIS DATE I SERVED A TRUE COPY OF THE DOCUMENT AFFIXED HERETO BY DEPOSITING A COPY THEREOF, ENCLOSED IN A SEPARATE ENVELOPE, POSTAGE PREPAID, IN THE UNITED STATES MAIL, ADDRESSED TO THE PETITIONER AT THEIR ADDRESS AS SHOWN ON THE DOCUMENT(S).

**Writ of Habeas Corpus**

```
Margaret Littlefield
Law Office of Michael Satris
P.O.BOX 337
Bolinas, CA 94924
```

EXECUTED AT SAN FRANCISCO, CALIFORNIA ON JANUARY 19, 2010

BY_____ DEPUTY CLERK, SUPERIOR COURT
Fausto Howay

**COPY**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

In re JAMES CARLIN,

on Habeas Corpus.

A127919

| Court of Appeal, First Apellate District |
| --- |
| **FILED** |
| APR 2 7 2010 |
| Diana Herbert, Clerk |
| by _____ Deputy Clerk |

(San Francisco County
Super. Ct. No. 5995)

THE COURT:

The petition for writ of habeas corpus is denied.

(Reardon, Acting P.J., Sepulveda, J., and Rivera, J., joined in the decision.)

Date: APR 2 7 2010          **REARDON, ACTING P.J.** _____ P.J.

Court of Appeal, First Appellate District, Division Four - No. A127919

## S182521

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

In re JAMES CARLIN on Habeas Corpus.

The petition for review is denied.

SUPREME COURT
FILED

JUN 30 2010

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE
_____
*Chief Justice*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JAMES CARLIN,

    Petitioner,

v.

ROBERT WONG, Acting Warden,

    Respondent.

No. C 06-4145 SI

**ORDER GRANTING MOTION FOR
APPOINTMENT OF COUNSEL**

    Petitioner has filed a motion for appointment of counsel to represent him in this action. Petitioner has submitted a declaration stating that he is unable to prepare court pleadings. Petitioner has also submitted the declaration of Margaret Littlefield, an attorney employed by the Law Offices of Michael Satris. Ms. Littlefield states that her office assisted petitioner with several state petitions for writs of habeas corpus, and filed the instant petition as well as the opposition to respondent's motion to dismiss. Littlefield states, *inter alia*, that it is her opinion that petitioner is not able to adequately present his legal claims to the Court. Littlefield also states that she or Michael Satris would be available for appointment in this case should the Court decide to appoint counsel.

    A district court may appoint counsel to represent a habeas petitioner whenever "the court determines that the interests of justice so require and such person is financially unable to obtain representation." 18 U.S.C. § 3006A(a)(2)(B). The decision to appoint counsel is within the discretion of the district court. *See Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986), *cert. denied*, 481 U.S. 1023 (1987).

    The Court finds that petitioner's claims raise complex legal issues, and that petitioner is unable to financially retain counsel. Accordingly, the Court GRANTS petitioner's motion for appointment of

United States District Court
or the Northern District of California

1    counsel, and APPOINTS Margaret Littlefield as petitioner's counsel. (Docket No. 16). Petitioner shall

2    file a traverse on or before **April 30, 2007**.

3

4       **IT IS SO ORDERED.**

5

6    Dated: April 3, 2007

7                                   SUSAN ILLSTON
                                     United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28